UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO.: 3:23-cv-383

JANE DOE #1,

       Plaintiff,

vs.

CROWLEY MARITIME CORPORATION,
and JUAN EMILIO BLANCO,

       Defendants.

_____/

## SEX TRAFFICKING COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff JANE DOE #1, by and through her undersigned counsel, and hereby files this Complaint for damages and Demand for Jury Trial against Defendants CROWLEY MARITIME CORPORATION and JUAN EMILIO BLANCO.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, because this action asserts violations of 18 U.S.C. § 1591, *et seq.*, and therefore raises federal questions regarding the deprivation of Plaintiff's rights. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

2.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

3.    Plaintiff Jane Doe #1 ("Ms. Doe") is a former employee of Crowley Maritime Corporation and a citizen and resident of the country of El Salvador.  Ms. Doe is suing under a pseudonym to protect her privacy.

4.    Defendant Crowley Maritime Corporation ("Crowley") is a Delaware corporation with a principal place of business located in Jacksonville, Florida.

5.    Defendant Juan Emilio Blanco ("Blanco") is a former employee of Crowley Maritime Corporation and, upon information and belief, a citizen of the country of El Salvador.

## FACTUAL ALLEGATIONS

### I.  October 2016: Ms. Doe is Hired by Crowley

6.    Ms. Doe began working for Crowley in approximately October of 2016, when she was 30 years old.

7.    Due to her talents, experience, and ability to speak both English and Spanish, Ms. Doe was hired by Crowley as an "onboarding coordinator" in Crowley's "Inland Transportation Department," also known as the "Inland Transportation Group," or more commonly, the "Inland Department."

2

8.    The Inland Department had employees who were physically located within the United States as well as employees located outside of the United States, including employees in El Salvador.

9.    Ms. Doe was hired to work in Crowley's office in San Salvador, El Salvador. Crowley maintains a large presence in El Salvador where it employs hundreds of workers through wholly owned subsidiaries.  Crowley boasts it has more than 55 years' experience providing shipping and logistics services between El Salvador and the United States.

10.    Throughout Ms. Doe's employment with the company, Crowley exercised direct control over its Inland Department employees in El Salvador from its headquarters in Jacksonville, Florida, including exercising final decision-making authority over hiring and terminating Inland Department employees within its El Salvador offices—including Ms. Doe.

11.    Crowley hired Ms. Doe through Crowley Shared Services, S.A. de C.V.—one of Crowley's many wholly owned subsidiaries.

12.    Upon information and belief, Crowley Shared Services, S.A. de C.V. is a wholly owned subsidiary of Crowley Corporate Services, Inc., a Delaware Corporation.

13.    Upon information and belief, Crowley Corporate Services, Inc. is a wholly owned subsidiary of Crowley Maritime Corporation.

14.    Upon information and belief, Crowley Maritime Corporation is a wholly owned subsidiary of the holding company Crowley Holdings, Inc.—a Delaware corporation.

15.    The decision to hire Ms. Doe was made by Defendant Blanco and approved by former Crowley employee Jose Lopez, who worked at Crowley's headquarters in Jacksonville, Florida in the United States.

16.    Jose Lopez is a U.S. citizen who was employed by Crowley through one or more of its U.S. subsidiaries, including Crowley Logistics, Inc. According to Crowley employment records, Lopez was initially hired as an accountant. Lopez began working at Crowley in June of 2012 and stayed with the company until his "resignation" in 2018.

17.    Ms. Doe's direct supervisor within the Inland Department and the most senior member of the Inland Department in Crowley's San Salvador office was Defendant Juan Emilio Blanco.

18.    During the events described in this complaint, Defendant Blanco reported directly to Jose Lopez, and Jose Lopez reported to Crowley executive Bob Weist, who was Vice President (VP), North America Transportation.

19.    According to Crowley employment records, Blanco was hired by Crowley in 2010 and worked for Crowley until he was fired on January 24, 2018 for reasons directly related to events described in this Complaint.

20.    Blanco, Lopez, Weist and others in Crowley senior management referred to Crowley's Inland Department office in El Salvador as the Inland Department "Admin" team or the "Administration" team.

21.    In his resignation letter dated June 26, 2018, which was sent to senior Crowley executives Tiffany King and Bob Weist, Jose Lopez thanked Crowley for giving him the opportunity to "*manag[e] the Admin department for Crowley…*"

22.    By maintaining an office in El Salvador, Crowley benefitted financially by hiring talented, educated, English-speaking white-collar workers and then paying those workers only 10-20% of what the company would have been required to pay similarly skilled and qualified workers in the United States.

23.    When Crowley hired Ms. Doe, the company paid her a salary of approximately $8,000 per year.

24.    From an operational perspective, Crowley did not distinguish between its Inland Department team members based on where they were physically located. For example, Crowley maintained company-wide, unified Human Resources and "Ethics" departments, processes, and databases that encompassed its workers located within the United States as well as its workers located in El Salvador.

25.    Crowley also required Ms. Doe and all Inland Department team members in El Salvador to write emails exclusively in English. The only exceptions to Crowley's "English only" rule for Ms. Doe and other Inland Department team

members were when: 1) sending emails to, or communicating with, Human Resources (HR) in El Salvador; or 2) communicating with clients or partners in Puerto Rico who preferred to communicate in Spanish.

26.    While working within Crowley's Inland Department, Ms. Doe's daily tasks included communications with Crowley's internal trucking and logistics brokers at Crowley headquarters in Jacksonville, Florida. She performed administrative tasks to assist these Crowley employees with facilitating the shipments of large volumes of cargo for Crowley's customers, including providing transportation and logistics services to the United States Department of Defense.

27.    In her role as an "onboarding coordinator," Ms. Doe assisted with onboarding new truck drivers, renewing certificates with truck drivers, manually entering data into Crowley's data management systems, and other administrative tasks requested of her by Blanco, Lopez, or Crowley's transportation brokers.

28.    After approximately 3 months at Crowley, Ms. Doe also began to index documents related to trucking shipments on behalf Crowley employees in the United States.

29.    Ms. Doe worked for Crowley from approximately October of 2016 until approximately June of 2018. Around June of 2018 a close family member became ill, and Ms. Doe ended her employment at Crowley in order to care for her family

member. Before Ms. Doe left Crowley in 2018, she had been promoted to manager.

30.    After her family member's health improved, Ms. Doe returned to work for Crowley. She was given a new position as an analyst and worked at Crowley again, until deciding to leave the company for the final time in January of 2020.

## II. January 2023: Ms. Doe Learns a Former Co-Worker Has Filed a Lawsuit Against Crowley and Defendant Juan Emilio Blanco in the United States

31.    In January of 2023, approximately three years after she quit her job at Crowley, Ms. Doe read a news report and then numerous social media posts regarding a lawsuit filed against Defendants Crowley Maritime Corporation and Juan Emilio Blanco by Vanessa Treminio, a former co-worker of Ms. Doe's within Crowley's Inland Department. Vanessa Treminio's amended complaint, Case No. 3:22-cv-174-MMH-PDB, pending in this Court against Defendants Crowley and Blanco, is attached hereto as "**Exhibit 1.**"

32.    The news of Treminio's lawsuit and the details contained within Treminio's amended complaint were extremely disturbing and highly distressing to Ms. Doe. News reports of Treminio's lawsuit triggered deep emotional pain and trauma related to Ms. Doe's own horrific experiences with Defendants Crowley and Blanco, because Ms. Doe had also endured sexual abuse at Crowley and had also been sexually trafficked.

### III. October 2016: As Ms. Doe Joins Crowley's Inland Department, Blanco Begins Subjecting Her to a Pattern of Extreme Sexual Harassment

33.     As soon as she began working for Crowley, Defendant Juan Emilio Blanco began subjecting Ms. Doe, as well as other women in the Crowley office, to a pattern of extreme workplace sexual harassment. Blanco's conduct was severe and pervasive and fostered a hostile, abusive, and offensive work environment.

34.     Crowley was aware of Blanco's abhorrent workplace behavior even before assigning Ms. Doe to his team. Shortly after she was hired, several members of the Inland Department told Ms. Doe that it was well known within Crowley that Blanco had been transferred to the Inland Department from Crowley's Procurement Department after several subordinates from his former department made complaints against him for workplace sexual misconduct.

35.     Ms. Doe was also told that Blanco, who was married, had begun having an extra-marital affair with one of his subordinates in Crowley's Procurement Department, named Caro, which was a violation of Crowley policies that the company nonetheless tolerated.

36.     However, because Blanco was a "star performer," and because of his ability to drive profits for Crowley, instead of terminating Blanco's employment with Crowley following multiple reports of workplace sexual misconduct, Crowley simply transferred Blanco to a new department.

37.    While Blanco was leading the Inland Department team in El Salvador, Crowley continued to receive complaints from female employees regarding Blanco's sexually inappropriate and abusive conduct toward women who worked under him, and even from women who did not directly report to Blanco. However, Crowley did not take action to stop or prevent the sexually inappropriate and abusive conduct in the workplace.

38.    For years, despite Crowley's knowledge that Blanco was a sexual predator who terrorized its own female employees in its own offices, and despite numerous complaints of workplace sexual misconduct filed against Blanco by female Crowley employees—including at least one credible allegation that Blanco raped a female subordinate on a business trip to Jacksonville, Florida in November 2017—Crowley never took any negative employment actions against Blanco until the company finally and grudgingly terminated his employment on January 24, 2018 for reasons directly related to this complaint.

39.    Instead, for years Crowley actively enabled and facilitated Blanco's sexual torment of both male and female employees within its offices and during Crowley-sponsored events and business trips.

### IV. <u>November 2016: Blanco Forces Ms. Doe to Watch a Pornographic Video in the Crowley Offices</u>

40.    One afternoon, approximately one month after starting her employment with Crowley, Blanco ordered Ms. Doe to meet him at a desk in the Crowley office that

was away from other co-workers and where there was privacy. Blanco also ordered one of Ms. Doe's female coworkers to meet him at the desk.

41.    Blanco told Ms. Doe and her coworker that he wanted to show them a "funny video." Ms. Doe found this situation extremely unusual.

42.    Blanco proceeded to pull out his phone and force Ms. Doe to watch a pornographic video of transexual males engaging in sex acts. Mr. Doe was shocked and did not know what to say or how to respond. Blanco then noted that Ms. Doe was blushing and began to ridicule her. Blanco stated that not even Ms. Doe's male coworker "Lucho" was going to be as uncomfortable watching the video as Ms. Doe was. This statement by Blanco indicated to Ms. Doe that Blanco was forcing many, or all, of his subordinates to watch the pornographic video under similar circumstances.

43.    After a short time, without saying anything, Ms. Doe simply turned and walked away from Blanco to return to her desk where she sat in stunned silence.

44.    Following the incident in which Blanco forced her to watch a pornographic video in the Crowley offices, Ms. Doe no longer felt comfortable or safe working at Crowley, and she began looking for a new job.

**V.    November 2016: Ms. Doe Wins an Award for Superior Performance**

45.    Approximately one week after Blanco forced her to watch a pornographic video in the Crowley offices, Ms. Doe was given a "TOPS" award by Crowley for

superior performance. It was her supervisor, Blanco, who nominated Ms. Doe for the TOPS award.

46.    Ms. Doe was given the TOPS award based on work she had been performing involving the location and indexing of the U.S. tax identification numbers of Crowley's transportation contractors in the United States. Because of her thorough efforts on the assignment, Ms. Doe was told that she had saved Crowley approximately $60,000, which was approximately 7.5 times the annual salary Crowley was paying her.

47.    After receiving the TOPS award and the significant professional recognition that accompanied the award, Ms. Doe changed her mind about leaving Crowley. Instead of finding work at a new company to escape from Blanco, Ms. Doe formulated a plan to attempt an internal transfer to a different team after a few months. Per Crowley policy, there was a waiting period of several months for internal transfers by new hires.

48.    After she received the TOPS award, Blanco's pervasive and persistent sexual harassment of Ms. Doe continued, and he continued to make outrageously inappropriate sexual comments to her and to other team members.

49.    It was rare that Ms. Doe had any interaction with Blanco in which he did not say or do something sexually inappropriate. His sexual harassment of his

subordinates was not limited to Ms. Doe or only to women. Ms. Doe frequently heard Blanco make homophobic remarks to male co-workers as well.

50.    Ms. Doe also heard Blanco openly and frequently refer to women in a different department with offices adjacent to the Inland Department offices as "whores," she heard Blanco speculate out loud regarding the types of sex and sexual acts these women preferred, *i.e.*, "rough sex," "group sex," "oral sex," etc.

51.    Ms. Doe noticed that some Inland Department team members would laugh at Blanco's constant sexually explicit and harassing comments. A few men within the Department, who were friends with Blanco, were active participants in his sexual harassment. But Ms. Doe observed that many other team members only occasionally laughed at Blanco's outrageous comments and behavior as a coping strategy. These employees believed they needed to stay in Blanco's good graces to avoid being fired by Blanco and felt compelled to laugh at behavior they found extremely offensive and inappropriate.

52.    Ms. Doe's coping strategy was to isolate herself as much as possible from other team members and from Blanco.

## VI. **Early 2017: Blanco Torments, Sexually Harasses, and then Fires a New Team Member Because She Complained of Sexual Harassment and Rebuffed Blanco's Quid Pro Quo Sexual Advances**

53.　　In early 2017, approximately four or five months after Ms. Doe began working at Crowley, a Crowley employee named "L"[1] attempted an internal transfer into the Inland Department. "L" had been employed by Crowley for approximately 5 years at the time she attempted to transfer to the Inland Department.

54.　　To become a member of the Inland Department, "L" was required to complete two interviews. The first interview was conducted by Blanco and the second and final interview was conducted by Jose Lopez. Because Lopez generally worked from Crowley's headquarters in Jacksonville, Florida, Lopez typically conducted the interviews by telephone following Blanco's in-person interview in the San Salvador office. When Ms. Doe was hired by Crowley in October of 2016, she was also interviewed by both Blanco in El Salvador and Jose Lopez in the United States prior to being hired.

55.　　After "L" applied for an internal transfer to Crowley's Inland Department, Blanco scheduled an in-person interview with her. However, before the interview, Blanco somehow obtained a "sex tape" of "L" from "L's" ex-boyfriend without her permission as an act of revenge.

---

[1] "L" is a pseudonym used to protect the victim's privacy.

56.    The day before "L's" interview, Blanco sent "L's" sex tape to the entire Inland Department team in El Salvador, as well as Crowley employees who were not in the Inland Department, via messaging apps. Ms. Doe did not watch the video, but almost all the other members of the Department saw some or all of the sex tape prior to "L" joining the team.

57.    Following "L's" interview, Blanco told Ms. Doe and other members of the Inland Department team that he had decided to hire "L," in part, because he enjoyed her sex tape. After "L" joined the Inland Department team, Blanco and other members of his team taunted and humiliated "L" by frequently repeating phrases she had uttered in the video out loud to her and behind her back.

58.    Blanco also frequently and openly propositioned "L" to reenact sexual scenes from the video with him, and he strongly insinuated to "L" that her job security within the Inland Department was dependent on her engaging in sexual acts with him.

59.    "L," who had been employed by Crowley for more than 5 years, had only been a member of Crowley's Inland Department team for approximately one month when Crowley held a dinner for the entire Inland Department team at a restaurant near the Boqueron Volcano in El Salvador.

60.    In attendance at the dinner were Jose Lopez from Crowley headquarters in Jacksonville, Florida as well as Blanco.

61.   Before dinner, Ms. Doe and the entire Inland Department team were walking around the grounds of the restaurant admiring the Volcano as well as the impressive landscape. While walking around the grounds, "L" confided in Ms. Doe that Defendant Blanco, and another male co-worker named Mario were sexually harassing her and making her extremely uncomfortable. Ms. Doe advised "L" to report the behavior to Crowley HR the next day.

62.   As Mario continued to sexually harass "L" at the restaurant, she decided to openly complain to Blanco about Mario. Blanco then told Jose Lopez about the complaint. Instead of helping "L," Jose Lopez, Juan Blanco, Mario, and other male team members then began laughing at "L" and taunting her.

63.   Ms. Doe specifically recalls Crowley Inland Department Manager Jose Lopez telling "L" "*you should be happy that he's harassing you, that means he's interested in you. Look at you, you're not that young. You're old*!"  On information and belief, "L" was approximately 25 years old at that time.

64.   After the dinner, Blanco continued making sexual advances to "L" in the Crowley office. Blanco continued to proposition "L" to reenact sexual scenes from the sex tape with him and to insinuate that her job security was dependent on her engaging in sexual acts with him.

65.    Ms. Doe was aware of this behavior because she had been tasked with training "L" for her new position and worked closely with her.

66.     As "L" continued to rebuff Blanco's demands for sex, Blanco became more and more angry with her. Not long after the dinner at the Boqueron Volcano, while in the Crowley office, Ms. Doe overheard a conversation Blanco was having on his private cell phone.

67.     Ms. Doe heard Blanco say to the person on the other end of the call, "*I'm just going to have to fire her*." Ms. Doe could not be sure who Blanco was speaking with, but she suspected Blanco was speaking with Jose Lopez, and she knew that any decision to fire an Inland Department employee in the El Salvador office had to be approved by Jose Lopez in Jacksonville.

68.     Only a few minutes after Blanco ended that call, he came to Ms. Doe's desk. Blanco then ordered Ms. Doe to "*do quality control*" on "L's" work and told Ms. Doe to "*dig up any mistakes*" that "L" made, no matter how small, and report all mistakes to Blanco.

69.     Approximately two weeks later, Blanco fired "L," citing "performance" issues as the reason. Ms. Doe believed the firing of "L" was a sham and that the performance issues were completely pretextual.

70.     Later, when Ms. Doe became a manager for Crowley, she learned much more about Crowley's official policies regarding employee termination for performance.

71.   For example, because "L" was still within her training period, Ms. Doe learned that L's termination was clearly violative of Crowley's own policies.

72.   After Blanco and Lopez fired "L," Blanco would frequently boast to the Inland Department about the fact that he had simply snapped his fingers to have "L" fired and that he could do the same to anyone else in the office.

73.   Ms. Doe was especially afraid of Jose Lopez, because she knew that Lopez controlled the Inland Department through Blanco and Jacqueline Najera.

74.   Najera was the Crowley HR manager in El Salvador who was viewed by Ms. Doe and other female employees as someone who covered-up workplace sexual misconduct within the Crowley offices and enabled Lopez, Blanco, and other predatory male employees of Crowley.

75.   In one of Ms. Doe's only direct interactions with Jose Lopez, she called Lopez in Jacksonville to ask him a complex question about an application Lopez had been responsible for developing and that Ms. Doe was required to use for her job. Ms. Doe was able to get Lopez on the phone, but before she could finish asking her question, Lopez told her to "*eat shit*" and then hung up the phone on her. Ms. Doe believed Lopez viewed the women in Crowley's El Salvador office as less than human. Jose Lopez's management of the El Salvador office and his treatment of female employees would eventually be investigated by Crowley, and

would result in a formal investigation report, dated May 1, 2018, that is attached

hereto as "**Exhibit 2.**"

**VII.** **November 2016: Crowley Announces Award of the Defense Freight Transportation Services (DFTS) Contract by the U.S. Government**

76.    On November 28, 2016, less than 2 months after Ms. Doe began working for

Crowley, the company publicly announced that Crowley had been awarded a

"large, multi-year U.S. Department of Defense freight services contract" known as

the "Defense Freight Transportation Services ('DFTS')" contract.[2]

77.    In its November 28, 2016 press release announcing that Crowley had been

awarded the DFTS contract, CEO Tom Crowley said, "We are very proud and

appreciative of the opportunity to support our country and the Defense Department

with transportation and logistics services through this new TRANSCOM

contract…We will reward TRANSCOM's confidence in us by providing the

highest quality service with safety, integrity and high performance."[3]

78.    According to Crowley's press release, the DFTS contract had a value of $2.3

billion and was a "freight-all-kinds (FAK) contract" that encompassed "all forms

of surface transportation throughout the United States and Canada," including

---

[2] https://www.crowley.com/news-and-media/press-releases/crowley-awarded-large-multi-year-u-s-department-of-defense-freight-services-contract/
[3] *Id.*

"less-than-truckload (LTL) and full truckload (FTL) services" as well as "expedited, time-definite, and rail services."

79.    As Crowley began preparing to implement an enormous new logistics contract for the U.S. Department of Defense, the company began bolstering its Inland Department with both internal and external hires, and the Inland Department team grew in both the United States and El Salvador.

## VIII. June 2017: Vanessa Treminio Joins Ms. Doe as part of the Inland Department Team.

80.    On June 1, 2017, Crowley employee Vanessa Treminio joined Ms. Doe as a member of the Inland Department team in Crowley's San Salvador office.

81.    Mrs. Treminio joined the team as an internal transfer within Crowley. When Treminio became a member of the Inland Department, she had already been employed by Crowley for over 5 years.

82.    It was Mrs. Treminio who would eventually file suit against both Juan Emilio Blanco and Crowley Maritime Corporation in federal court in the United States in 2022 alleging sex trafficking, forced labor, as well as other causes of action against both Blanco and Crowley.

83.    Ms. Doe and Mrs. Treminio worked together at Crowley in the Inland Department in 2017 and 2018.

### IX. __July 2017: Juan Blanco Makes Crude Sexual Remarks to Ms. Doe in the Cafeteria Inside the Crowley Offices in Front of Co-workers__

84.     One day during July of 2017, the Inland Department team gathered in the cafeteria inside the Crowley offices to celebrate the birthdays of Ms. Doe and one other team member.

85.     Blanco was present, as was Blanco's wife, Caro. Ms. Doe's boyfriend at the time drove a pickup truck, and when casting sexually inappropriate remarks at Ms. Doe in the Crowley offices, Blanco would refer to her boyfriend as "the guy in the pickup truck."

86.     While the team was eating birthday cake—apropos of nothing—Blanco looked directly into Ms. Doe's eyes and told her he could picture the way her boyfriend "f__ked" her inside the truck. Blanco then began gyrating his hips and moving his body to imitate a sex act.

87.     Ms. Doe was shocked. Blanco's wife Caro gently hit Blanco on the shoulder, telling him to stop. A few male teammates who were friends with Blanco were laughing, while other male and female team members rolled their eyes, shook their heads, or looked away in disgust.

88.     Ms. Doe had created defenses to Blanco's sexual harassment in one-on-one situations, such as avoiding in-person interactions with him, removing herself from team group chats, isolating herself from others on the team, never smiling or acting friendly toward Blanco, and strictly limiting their discussions to work-related

topics. Blanco thus took advantage of group settings as opportunities to make outrageous and humiliating sexual comments toward Ms. Doe.

### X. <u>Summer of 2017: Blanco Becomes Intoxicated and Makes a Threatening Sexual Statement to Ms. Doe at a Seafood Restaurant in San Salvador During a Team Dinner</u>

89.    In the summer of 2017, Crowley hosted a dinner for the Inland Department team at a seafood restaurant in San Salvador, El Salvador. Ms. Doe, Mrs. Treminio, and most Inland Department team members were present.

90.    Several team members brought a bottle of liquor to the dinner and gave it to Blanco as a gift. Blanco drank from the bottle as well as from other alcoholic drinks served by the restaurant and became visibly intoxicated.

91.    During the dinner, while intrusively staring at Ms. Doe, Blanco said "*one day I'm going to get you drunk*," insinuating his intent to get her intoxicated so he could force sex on her.

92.    Ms. Doe was intimidated and frightened by Blanco's statement and the danger of future harassment and sexual assault it signified. One of her fellow team members told Blanco to "shut up," and told Blanco that what he said was inappropriate. Blanco simply laughed off this admonishment and continued to leer intrusively and sexually at Ms. Doe, reinforcing that his sexual threat to her was not an empty one.

93.    After this team dinner at a seafood restaurant in San Salvador, and after receiving what Ms. Doe interpreted as a sexual threat from Blanco, she was so terrified that she again decided to leave Crowley and subsequently began looking for new jobs. Although her plan had been to transfer to a new department within Crowley, she did not feel comfortable continuing to work for Blanco while attempting an internal transfer.

## XI. July 26, 2017: Crowley Definitively Awarded the Defense Freight Transportation Services (DFTS) Contract by the U.S. Government

94.    On July 26, 2017, after a contested legal battle over the initial award of the DFTS contract to Crowley by competing defense contractors, Crowley announced the U.S. Department of Defense had definitively awarded Crowley the DFTS contract.

95.    In August of 2017, Blanco announced to Ms. Doe and the entire Inland Department team that Crowley intended for much of its work on the DFTS contract to be conducted from Crowley's offices in San Salvador, El Salvador.

96.    Blanco announced the Inland Department team would be helping to provide logistics services to the U.S. Department of Defense and facilitating large volumes of interstate commerce throughout the United States as well as international commerce between the United States and Canada on behalf of the U.S. military.

97.    Blanco further announced that he would personally be choosing a few select team members to travel to Crowley headquarters in the United States with him for training on the implementation of the DFTS contract.

98.    To Ms. Doe and to all the other team members, these trips to the United States represented huge professional opportunities, and everyone on the Inland Department team wanted to be chosen.

99.    Ms. Doe was told that the employees selected by Blanco for travel to the United States had to be approved by Jose Lopez and possibly even more senior Crowley executives in the United States, but she also believed that Lopez and more senior Crowley executives would merely ratify Blanco's decisions regarding who would travel to the United States for DFTS training.

100.    Blanco subsequently created a kind of open competition for the international training opportunities, pitting team members against each other, to be selected to go on a trip to the United States.

101.    With a once-in-a-lifetime opportunity to travel to the United States now a possibility for Ms. Doe, she again changed her mind about leaving Crowley and decided to stay at the company and vie for this valuable opportunity.

## XII. October 2017: Ms. Doe's Co-Worker Vanessa Treminio is Selected by Blanco and Crowley to Travel to Jacksonville, Florida for DFTS Training.

102.   To Ms. Doe's knowledge, an experienced male Inland Department team member named Emilio had originally been selected to go on the first DFTS training trip to Jacksonville with Blanco.

103.   At the last minute, Blanco removed Emilio from the trip and selected Mrs. Treminio to travel with him to Jacksonville instead. Ms. Doe and other Inland Department team members were surprised by Blanco's decision and did not feel that Mrs. Treminio deserved to go on the trip, because she had only been a member of the Inland Department for less than 6 months, while Emilio, Ms. Doe, and others had more experience.

104.   Ms. Doe understood that to remove Emilio from the trip to Jacksonville so that he could replace him with Mrs. Treminio, Blanco may have placed Emilio into a contrived "action plan" or "Performance Improvement Plan (PIP)" under the pretext of poor work performance that was not actually deserved.

105.   Being removed from the business trip to Jacksonville and being placed into an "action plan" or PIP greatly angered Emilio, and on information and belief, Emilio, another Inland Department team member named Blanca, and at least one additional team member subsequently filed formal complaints against Blanco through Crowley's "Ethics" complaint process.

### XIII.      October 2017: Ms. Doe Sees Bruises on Mrs. Treminio's Arms.

106.    In October of 2017, in the office, Mrs. Treminio raised her arms, causing her sleeves to slide toward her shoulders, revealing deep bruising which appeared to be the result of someone forcefully grabbing Treminio's arm.

107.    Ms. Doe asked Mrs. Treminio about the bruises and asked, "What happened, . . . are you ok?" Mrs. Treminio became flushed and flustered, and she blurted out something about how the bruises were related to her "blood sugar" levels even though Mrs. Treminio does not have diabetes or blood sugar issues.

108.    However, because of Mrs. Treminio's fright and demeanor, Ms. Doe had a feeling Mrs. Treminio was hiding the real reason for the bruises on her arms.

109.    More than four years later, after Mrs. Treminio's lawsuit against Crowley and Blanco became public, Ms. Doe connected the dots and wondered if the bruises on Mrs. Treminio's arms that she had seen in October of 2017 were related to an incident, described in Treminio's amended complaint, in which Blanco sexually assaulted and attacked Mrs. Treminio inside an elevator at the Crowley offices. **Exhibit 1** ¶¶ 20, 21, 22, 23.

110.    After Treminio's lawsuit became public, Ms. Doe spoke with Mrs. Treminio, who confirmed that the bruises she had seen on her arms were from an assault by Blanco. However, Treminio explained that the bruises were not from the sexual assault in the elevator, but rather, from another incident with Blanco shortly

after she reported Blanco's sexual attack in the elevator to Crowley HR Manager, Jacqueline Najera. **Exhibit 1 ¶¶** 24-31.

111.  Following her meeting with Najera in which Treminio reported being sexually assaulted in the Crowley elevator, Treminio returned to her desk to find Blanco waiting for her, apparently tipped off by Najera to the fact Treminio had reported the assault to HR. **Exhibit 1 ¶¶** 32-36.

112.  Blanco then forcefully grabbed Treminio's arm while making angry threats to Treminio for reporting him to HR. Blanco grabbed Treminio with such force that he left significant bruising on the upper part of her arm. During their 2023 conversation, Treminio confessed to Ms. Doe that she had been afraid to tell her what Blanco had done or how she had sustained the bruising on her arms when Ms. Doe her asked in October of 2017.

### XIV. <u>November 5, 2017: Mrs. Treminio Flies to Jacksonville, Florida for DFTS Training. Blanco Allegedly Rapes Mrs. Treminio in Jacksonville During the Trip.</u>

113.  According to the lawsuit she filed against Crowley and Blanco in 2022, Inland Department team member Vanessa Treminio flew to the United States on November 5, 2017 for training on the Defense Freight Transportation Services (DFTS) contract. **Exhibit 1 ¶** 40. Ms. Doe remained behind at the Crowley offices in San Salvador.

114.   According to Mrs. Treminio's amended complaint, on the final night of the business trip in Jacksonville, Florida, Blanco fraudulently obtained access to Mrs. Treminio's hotel room, entered her room while Mrs. Treminio was asleep, and then forcibly raped her. **Exhibit 1** ¶¶ 41, 42, 43, 44, 45.

115.   According to Treminio's amended complaint, the next morning, she reported the rape to Jose Lopez and another Crowley employee at Crowley headquarters in Jacksonville, and was subsequently ridiculed and demeaned by Lopez, who told Treminio, among other offensive things, that being raped wasn't really a big deal because she was not a virgin when it happened. **Exhibit 1** ¶¶ 47, 48, 49, 50.

116.   According to Treminio's amended complaint, during a meeting inside a conference room at Crowley's headquarters in Jacksonville, Jose Lopez told Mrs. Treminio that no one was ever going to believe her story about being raped by Blanco, and Lopez threatened Mrs. Treminio that she should "*shut up*" about being raped if she wanted to keep her job. **Exhibit 1** ¶ 50.

117.   According to Treminio's amended complaint, on the afternoon of November 10, 2017, Mrs. Treminio flew back to El Salvador. According to her amended complaint, Blanco also flew back to El Salvador on November 10, 2017 and was aided in fleeing the United States by Crowley.

118.   According to her amended complaint, and according to Crowley's own sworn statements made under oath in Treminio's lawsuit, despite being aware of

Treminio's rape allegation, Crowley never reported Treminio's rape allegation to law enforcement officials in Jacksonville, Florida, never attempted to assist Mrs. Treminio in reporting the rape to law enforcement, and never investigated Treminio's reports of rape committed by Blanco. **Exhibit 1 ¶¶ 51, 52, 53, and Exhibit X.**

### XV. <u>November 13, 2017: Blanco Returns to Work at the Crowley Offices in San Salvador. Crowley Flies Mrs. Treminio to Puerto Rico to Work on a Disaster Relief Contract for the U.S. Government</u>

119.  On November 13, 2017, only days after allegedly raping his Inland Department subordinate Vanessa Treminio in a hotel room in Jacksonville, Florida, Blanco was back at work in Crowley's office in San Salvador. Ms. Doe was also in the office, completely unaware of what had allegedly transpired in Jacksonville between Blanco and Treminio or between Lopez and Treminio.

120.  Mrs. Treminio was not in Crowley's San Salvador office on Monday November 13, 2017. According to her amended complaint, immediately after reporting to Crowley that she had been raped by Blanco in Jacksonville, Crowley ordered Treminio to fly to Puerto Rico to work on a FEMA disaster relief project. **Exhibit 1 ¶ 54.**

121.  Ms. Doe eventually learned that Crowley had sent Vanessa Treminio to Puerto Rico, and she learned that a fellow Inland Department team member named "Lucho" had also been sent to Puerto Rico.

122.   Ms. Doe was not aware of the reason Crowley decided to send Mrs. Treminio to Puerto Rico immediately following her trip to Jacksonville, or why Crowley did not want Mrs. Treminio in the San Salvador office following her trip to Jacksonville.

### XVI. Week of November 13-17, 2017: Crowley Allows Blanco to Select His Next Victim. Blanco Tells Ms. Doe She Will Accompany Blanco on the Next DFTS Training Trip to Jacksonville, Florida.

123.   During the week of November 13-17, only days after allegedly raping Inland Department team member Vanessa Treminio in Jacksonville, Florida on a DFTS training trip, Blanco ordered Ms. Doe to join him for a one-on-one meeting in a conference room in the Crowley offices in San Salvador.

124.   During that meeting, Blanco selected Ms. Doe to travel with him to Jacksonville, Florida for DFTS training in January. Blanco told her that she would be required to obtain a travel visa—a process that Crowley would facilitate.

125.   For Ms. Doe, the news was both exciting and terrifying. She had never traveled internationally, did not possess a visa that would allow her to travel to the United States, and could never in her entire life have been able to afford to travel to the United States based on the salary of approximately $8,000 per year that she was earning at Crowley.

126.   For Ms. Doe, the opportunity to work on a high-profile contract for the U.S. Department of Defense, to obtain a travel visa that would allow her to travel back

and forth to the United States on business trips, and to actually visit the United States for training were all enormously valuable career opportunities. The DFTS training trip was the most significant professional opportunity of her life.

127.   On the other hand, the prospect of going on an international business trip with a man she considered a sexual predator—a man who had subjected her to humiliating and pervasive sexual harassment, forced her to watch nonconsensual porn, and sexually threatened her—was utterly frightening. Ms. Doe was painfully conflicted about the situation.

XVII.   **November 7, 2017: Crowley Vice President of Ethics and Compliance Arthur LaMoureaux Becomes Aware of Sexual Misconduct Allegations Against Juan Emilio Blanco and the Initiation of a Formal Investigation Into Blanco via EthicsPoint® Case #280**

128.   On the same day that Crowley allowed Blanco to select Ms. Doe as his next victim who would travel with him to the United States where he would attempt to rape her, Crowley was actively conducting a sexual misconduct investigation into Blanco based on formal ethics complaints filed against Blanco by some of his subordinates in the Inland Department via Crowley's EthicsPoint® incident management portal.

129.   Crowley allowed Blanco to select Ms. Doe for the DFTS training trip during the week of November 13-17, but the first *yet* known formal ethics complaint filed against Blanco for sexual misconduct by Inland Department subordinates was submitted to Crowley via EthicsPoint® on November 7, 2017. This EthicsPoint®

complaint against Blanco was assigned EthicsPoint® Case #280. The November 7, 2017 EthicsPoint® Case #280 is attached hereto as "**Exhibit 3.**"

130.   In her amended complaint filed in 2022, Vanessa Treminio alleges that she was raped by Blanco on the evening of November 9, 2017, or possibly the early morning of November 10, 2017, in her hotel room in Jacksonville, Florida. **Exhibit 1 ¶ 44.** Treminio alleges in her amended complaint that, before she was forced to go on the business trip, she begged Crowley Human Resources Manager Jaqueline Najera not to send her on the DFTS business trip with Blanco, because Blanco had already sexually assaulted Treminio and she was afraid that he would do it again in Jacksonville. **Exhibit 1 ¶¶ 24-39.**

131.   The existence of EthicsPoint® Case #280 proves that *prior to* Vanessa Treminio's alleged rape by Blanco in Jacksonville on November 9 or 10th, 2017, Crowley Vice President of Ethics and Compliance Arthur LaMoureaux was aware that extremely serious allegations of ongoing workplace sexual misconduct had been lodged against Blanco by a Crowley employee. **Exhibit 3.**

132.   The existence of EthicsPoint® Case #280 also proves that 2 months *prior to* Crowley allowing Blanco to procure and then transport Ms. Doe from El Salvador to the United States for the purposes of sexually attacking her on a DFTS training trip, Crowley Vice President of Ethics and Compliance Arthur LaMoureaux was aware that a Crowley employee in El Salvador had formally reported extremely

serious allegations via Crowley's EthicsPoint® platform that Blanco was engaging in a highly disturbing, dangerous, and longstanding pattern of workplace sexual misconduct. **Exhibit 3.**

133.   Arthur LaMoureaux is listed on EthicsPoint® Case #280 as one of the "*case assignees*," along with Crowley's Global Director of Human Resources and Equal Employment Opportunity (EEO) coordinator Tiffanny King, Melvin Dodson, Zoraida Jirau, Crowley's Director of Ethics and Compliance Greg Kencitzski, Senobia Matute, Susan Michel, and Heitzel Monroy. **Exhibit 3**.

134.   On November 7, 2017, the "reporter" who submitted the complaint that became EthicsPoint® Case #280 wrote of Juan Emilio Blanco: "*He is constantly yelling at personnel in general [cursing] at some of them and [threatening] us with contract termination. He constantly (everyday) makes sexual comments about people from the team and from different teams. He conceals, promotes and approves this kind of behavior among the team in different practices such as Whatsapp group conversation sending sexual comments about people from the team and outside the team… This is an ongoing behavior, it happens everyday, some days it's [worse] than others and some good resources have already quit working here because of his behavior… Juan makes really offensive sexual comments at all time of the day about people in the team and people from other teams. He encourages this kind of behavior among the team and has made some*

instant messaging groups in which he gives nicknames to men and women in the company, which goes from *"fuck face"* to making really bad comments such as *'I would love to f... that girl, I bet she is really good at.....'.... he even makes obscene signs at us with his middle finger...*" **Exhibit 3**.

135.   On November 7, 2017, the reporter of what became EthicsPoint® Case #280 also wrote that he or she had "*witnessed and suffered this behavior since I started working in this company*," that Blanco's sexually abusive behavior had been ongoing for at least "*3 months to a year*," that he or she had been personally affected by Blanco's sexual misconduct, and that employees were "*afraid that he will do something to them if he finds out that they have presented a report in HHRR* [Crowley Human Resources]. **Exhibit 3.**

**XVIII.** **November 9, 2017: Two Additional Crowley Employees File EthicsPoint® Complaints Alleging Hostile Work Environment and Workplace Sexual Misconduct Against Juan Emilio Blanco. Complaints are Received by Senior Crowley Leaders, Including Crowley Vice President of Ethics Arthur LaMoureaux.**

136.   Two days after the first *yet* known Crowley employee submitted the workplace sexual misconduct complaint against Juan Blanco that became EthicsPoint® Case #280, two additional Crowley employees filed EthicsPoint® complaints alleging "*hostile [work] environment*" and workplace sexual misconduct against Blanco.

137.   The November 9, 2017 EthicsPoint® complaint against Blanco that became EthicsPoint® Case #282 is attached hereto as "**Exhibit 4.**"

138.   The November 9, 2017 EthicsPoint® complaint against Blanco that became EthicsPoint® Case #283 is attached hereto as "**Exhibit 5.**"

139.   EthicsPoint® Cases #282 and #283 were sent to Crowley VP of Ethics Arthur La Moureaux, Crowley's Global Director of Human Resources and Equal Employment Opportunity (EEO) coordinator Tiffany King, Melvin Dodson, Zoraida Jirau, Greg Kencitzski, Senobia Matute, Susan Michel, and Heitzel Monroy.

140.   In her amended complaint, Vanessa Treminio alleges that she was raped by Juan Blanco in Jacksonville late in the evening November 9 or the early morning of November 10, 2017. **Exhibit 1** ¶¶ 41, 42, 43, 44, 45. *Before* Treminio was allegedly raped by Blanco in Jacksonville, senior Crowley leaders, including Crowley's VP of Ethics Arthur La Moureaux, were in possession of *at least* 3 formal EthicsPoint® complaints made by Crowley employees alleging hostile work environment and extreme workplace sexual misconduct against Blanco.

141.   During the workday on November 9, 2017, while in possession of substantial evidence that Blanco was a sexual predator, the numerous senior Crowley leaders in possession of the 3 EthicsPoint® complaints that had already been made against Blanco also knew that Blanco was on that same day in

Jacksonville for DFTS training, and staying at a hotel with two young, vulnerable, isolated, and nearly powerless female subordinates from El Salvador. Had Crowley taken immediate action against Blanco on November 7, 2017 in response to EthicsPoint® Case #280, or if Crowley had taken immediate action on November 9, 2017 after having received *at least* 3 EthicsPoint® complaints against Blanco, Vanessa Treminio's alleged rape by Blanco could easily have been prevented.

142.   EthicsPoint® Case #282, submitted on November 9, 2017—apparently by a male subordinate of Blanco—alleged that Blanco created a "*hostile [work] environment*," that Blanco created "*tension*" in the Inland Department that felt "*like a witch hunt*," that Blanco was "*very arrogant and egocentric*," and that Blanco engaged in workplace "*harassment*." **Exhibit 4**.

143.   On December 6, 2017, Crowley's Human Resources Director for Central America Senobia Matute wrote in response to EthicsPoint® Case #282, "*Dear reporter [complainant], Next week I will be in El Salvador, Tuesday [December] 12 and Wednesday 13 [2017] in the morning. I hope we can have the opportunity to talk about your report and the observations you have made in the same way.*" **Exhibit 4**.

144.   EthicsPoint® Case #283, submitted on November 9, 2017—apparently by a female subordinate of Blanco—made extraordinarily serious allegations of extreme workplace sexual harassment against Blanco, and included an allegation that

Blanco had retaliated against a female Crowley employee who reported being sexually harassed by one of Blanco's male friends in the Inland Department by firing the victim and protecting the man who had sexually harassed her. **Exhibit 5**.

145.   In EthicsPoint® Case #283 the employee complainant wrote, "*I'm reporting Juan Emilio Blanco, Inland operations supervisor…a few months ago there was an incident of sexual harassment inside the team. She [the victim] reported that [sexual harassment] to Juan Emilio Blanco and instead of starting a process against the man who harassed her, he [Blanco] started a process against her [the victim]…and at the end she got fired, because the one who committed the [sexual harassment] is one of his [Blanco's] favorites…Also he [Blanco] refers to women (not from the team) in a disrespectful way, calling them names (offensives or sexists even misogynists)…Most of these events have not been reported because of fear of losing the job. But the situation has become unbearable.*" **Exhibit 5.**

146.   On November 15, 2017 at 5:09 PM, Senobia Matute updated EthicsPoint® Case #283 to reflect that she had been able to identify and speak with the woman who filed the ethics complaint against Blanco. Matute wrote, "*Today I reached the person that reported the incident. Further information was given. A formal report will be prepared on the case.*" **Exhibit 5**.

147.   On November 20, 2017 at 3:11PM, five days after Senobia Matute updated EthicsPoint® Case #283, Heitzel Monroy, Crowley's Regional Director, Audit,

Compliance & Ethics for Central America & Puerto Rico, sent an electronic message to Crowley's VP of Ethics Arthur LaMoureaux. The electronic message from Monroy to LaMoureaux is attached hereto as "**Exhibit 6.**"

148.  The subject line of Monroy's electronic message to LaMoureaux was "*Casos SAL*," which could be translated as "Cases El Salvador." Attached to the message to LaMoureaux were three documents, which were titled 280.docx, 282.docx, and 283.docx. It is not clear why these documents had taken out of EthicsPoint® and subsequently converted into editable Microsoft Word files. But what does seem clear is that the three attachments corresponded to EthicsPoint® Cases #280, 282, and 283, and that on November 20, 2017—ten days *after* Blanco allegedly raped Vanessa Treminio, but nearly two months *before* Blanco sexually attacked, assaulted, and terrorized Ms. Doe on a subsequent DFTS training trip to Jacksonville—Arthur LaMoureaux and Crowley leadership at the highest levels of the company were well aware that Juan Blanco was a sexual predator. **Exhibit 5**.

149.  Despite this knowledge, Crowley never took any negative employment action against Blanco on the basis of at least 3 EthicsPoint® Case reports, and an unknown number of other reports and complaints about Blanco, that Crowley received prior to Ms. Doe's trip to Jacksonville in January of 2018.

## XIX.  Late November or Early December, 2017: Vanessa Treminio Calls Crowley's Vice President of Ethics and Compliance Arthur LaMoureaux to Make a Formal Ethics Complaint Against Juan

**Emilio Blanco Alleging that Blanco Raped Her in Jacksonville During a DFTS Training Trip Less Than One Month Earlier.**

150.   According to her amended complaint, Vanessa Treminio was raped by Blanco late on November 9, 2017 or early in the morning of November 10, 2017 during a DFTS training trip in Jacksonville. According to her amended complaint, on the morning of Friday November 10, 2017 she went to Crowley's headquarters and immediately reported the rape to Crowley Inland Department Manager Jose Lopez, who, according to Treminio's amended complaint, threatened her to stay silent about the rape, and made many other disgusting, dehumanizing, and potentially criminal responses to the rape allegation.  **Exhibit 1 ¶¶ 47, 48, 49, 50.**

151.   According to her amended complaint, instead of sending Treminio back to work in her El Salvador office following the trip to Jacksonville during which she was allegedly raped by Blanco, Crowley quickly shipped Treminio off on a sudden, extended work trip to Puerto Rico. Treminio arrived in Puerto Rico on Monday November 13, 2017—only days after her alleged rape. **Exhibit 1 ¶¶ 54-57**.

152.   According to her amended complaint, at the urging of Crowley employee Ayesha Diaz, who was Mrs. Treminio's supervisor in Puerto Rico, Treminio called LaMoureaux and reported the rape. According to the amended complaint, "*On the call, Mr. LaMoureaux asked Mrs. Treminio for her permission to conduct an investigation. Mr. LaMoureaux specifically asked Mrs. Treminio if she would give*

*him permission to go to the hotel in Jacksonville where she was raped to check the hotel's files, to interview employees, check the hotel's security cameras, and complete other necessary investigatory steps. Mrs. Treminio gave LaMoureaux her permission...*" **Exhibit 1 ¶** 65.

153.   According to Treminio's amended complaint, "*About two weeks after she reported her rape and the aftermath to Arthur LaMoureaux, Mrs. Treminio was still in Puerto Rico when she received a call from LaMoureaux. First, LaMoureaux apologized for what had happened to her in Jacksonville. Then LaMoureaux told Mrs. Treminio that Crowley's investigation was able to prove that Mrs. Treminio was telling the truth about being raped by Juan Emilio Blanco. Accordingly, Crowley had decided to terminate the employment of Juan Emilio Blanco and two additional employees. According to LaMoureaux, as a result of Crowley's ethics investigation, Crowley also fired Jose Lopez, who had intimidated Vanessa into silence inside the Crowley headquarters, compared Mrs. Treminio to a used car, told Mrs. Treminio that she should be grateful Juan Emilio Blanco had raped her, and then helped Mr. Blanco flee the United States in an effort to escape justice.*" **Exhibit 1 ¶¶** 66-67.

154.   Mrs. Treminio returned to El Salvador from Puerto Rico on December 30, 2017. In the early days of January 2018, Mrs. Treminio returned to the Crowley

office in San Salvador expecting—based on what Arthur LaMoureaux had assured her—that Juan Emilio Blanco would no longer be working for Crowley.

155.  Mrs. Treminio was therefore shocked, confused, and completely terrified to see Blanco walking around the Crowley offices in San Salvador in early January 2018 as if nothing had happened and without a care in the world. Mrs. Treminio has testified under oath in a deposition related to her ongoing sex trafficking and forced labor lawsuit against Crowley that seeing Blanco in the office that day "*felt like getting raped all over again.*"

### XX. Crowley Admits Under Oath in a Sworn Legal Document that LaMoureaux Received a Report from Vanessa Treminio Alleging Blanco Raped Her in Jacksonville, Yet Crowley Also Admits Under Oath in the Same Sworn Legal Document that Crowley's Vice President of Ethics & Compliance Never Told ANYONE Else at Crowley About the Rape Allegation.

156.  In Crowley Maritime Corporation's Response to Interrogatories, submitted on March 15, 2023 in Treminio's related sex trafficking and forced labor litigation against Crowley, the company wrote, in response to Interrogatory #11 (attached hereto as "**Exhibit 7**"): "*Therefore, from the time of…[Vanessa Treminio's] alleged sexual assault [on November 9, 2017] until the time Defendant Blanco was terminated [on January 24, 2018], there is one individual, Arthur LaMoureaux, c/o Alexander DeGance Barnett L.A., who became aware of Plaintiff's allegation that she was sexually assaulted by Defendant Blanco while on a trip to Jacksonville. Plaintiff disclosed this information to Mr. LaMoureaux in or around December or*

40

*January 2018 and asked him to keep it confidential and not to disclose it to Human Resources. Mr. LaMoureaux also informed Plaintiff of an investigation Crowley's Human Resources Department was conducting regarding Defendant Blanco.*" **Exhibit 7**.

157.   According to her amended complaint, and to Treminio's testimony under oath in her related sex trafficking and forced labor litigation against Crowley, Vanessa Treminio's first call with Arthur LaMoureaux occurred while she was in Puerto Rico working on a FEMA disaster relief contract for Crowley, and on the same day she received a call from Crowley HR Director Senobia Matutue, who was conducting a sexual misconduct investigation into Blanco based on the receipt of EthicsPoint® Cases #280, 282, and 283. **Exhibit A ¶¶ 64, 65**.

158.   Treminio departed Puerto Rico and returned to El Salvador on December 30, 2017; thus Crowley's Vice President of Ethics & Compliance Arthur LaMoureaux was aware of criminal rape allegations made against Blanco by at least December 30, 2017, and likely weeks earlier. However, Crowley has admitted under oath that in response to the reported rape, LaMoureaux never notified law enforcement in Jacksonville, never conducted an investigation, never notified anyone else at Crowley, and took no action against Juan Blanco, but instead kept the reported sex crime "*confidential*." **Exhibit 7**.

159.   When Vanessa Treminio returned to El Salvador on December 30, 2017, she had reported her rape to LaMoureaux, and there was still more than a week remaining until Crowley and Blanco would traffic Ms. Doe from El Salvador to Jacksonville, Florida, and two weeks until Ms. Doe would also be sexually abused by Blanco. Tragically, Crowley's Vice President of Ethics & Compliance could have prevented this sexual abuse by taking appropriate action in response to an incredibly serious allegation of rape that Crowley admits under oath was reported to him by Treminio.

160.   Ms. Doe could have easily been spared the horror of being trafficked to the United States where she was sexually attacked by a man Crowley had been repeatedly warned was a sexual predator. Instead, Crowley has admitted that LaMoureaux did nothing to prevent the sexual abuse Ms. Doe endured.

### XXI. **December, 2017: Crowley Assists Ms. Doe in Obtaining a Non-Immigrant Travel Visa to the United States.**

161.   A few weeks after Ms. Doe's mid-November 2017 one-on-one meeting with Blanco, during which Blanco told Ms. Doe he had selected her to travel with him on the next DFTS training trip to Jacksonville in January of 2018, Crowley sent Ms. Doe to the U.S. embassy in San Salvador with a letter, printed on Crowley letterhead, in support of her application for a non-immigrant visa to the United States. When Crowley sent Ms. Doe to the embassy in San Salvador, Mrs. Treminio was still in Puerto Rico.

162.   At that time, Crowley's VP of Ethics and Compliance Arthur LaMoureaux was actively participating in an investigation into allegations of extreme workplace sexual misconduct committed by Blanco (**Exhibit 6**), while simultaneously keeping "*confidential*" an allegation that Blanco had recently committed a felony sex crime in the United States against one of his subordinates while on a DFTS training trip. **Exhibit 7**.

163.   The letter Crowley gave to Ms. Doe was written on Crowley letterhead and addressed to the Honorable Consul General, Consulate of the United States of America, San Salvador, El Salvador. The letter stated that Crowley Maritime Corporation was a U.S.-based corporation headquartered in Jacksonville, Florida, and that Ms. Doe was an employee of Crowley Maritime Corporation.

164.   Crowley's letter to the Honorable Consul General stated that there were trainings and meetings in the United States that required the participation of Ms. Doe, and that all travel expenses, including airfare, transportation, meals, lodging, and training would be paid for by Crowley Maritime Corporation.

165.   Crowley's letter requested the assistance of the Consul General in granting a non-immigrant visa to Ms. Doe to attend the DFTS training in Jacksonville, Florida. Because of Crowley's letter and influence, and because of the importance of the DFTS contract to the United States Department of Defense, by mid-December of 2017, only a few weeks after her visit to the U.S. embassy, Ms. Doe

was granted a temporary non-immigrant visa to attend the DFTS training in January.

166.   Crowley would eventually assist Ms. Doe in obtaining a 10-year work and travel visa to the United States, which was a document that would have been impossible for Ms. Doe to obtain without Crowley's facilitation and financing of the visa application process.

167.   Not long after her visa application was approved, and as the date of the DFTS trip to Jacksonville approached, Blanco approached Ms. Doe in the office and told her he was actively searching hotels in Jacksonville, and that he was "*going to get a real nice hotel for you.*" This comment frightened Ms. Doe. Blanco's tone and demeanor were threatening and made Ms. Doe feel that Blanco was communicating that he would be physically in control of her life, and even where she slept, while in Jacksonville.

XXII.   **Mid to Late December, 2017: Ms. Doe Requests a Private Meeting With Crowley HR Manager Jaqueline Najera and Tells Najera She Does Not Feel Safe Traveling to the U.S. with Blanco. Najera Ignores Ms. Doe's Safety Concerns and Threatens to Fire Her in Response.**

168.   After Ms. Doe obtained her travel visa, and after Blanco told Ms. Doe he was choosing "*a real nice hotel*" for her, Ms. Doe requested a private meeting with Crowley Human Resources Manager Jaqueline Najera because she did not feel safe traveling to the United States with Blanco.

169.   Ms. Doe did not want anyone to see her speaking with Najera, especially Blanco, because she feared retaliation, particularly after the abuses of power she had witnessed with regard to "L" and other women at Crowley.

170.   Ms. Doe's meeting with Crowley HR Manager Jaqueline Najera occurred in mid to late December of 2017, not long before Ms. Doe's trip to the United States for the DFTS contract implementation training.

171.   Ms. Doe was very nervous because it was the first time she had ever gone to HR at Crowley to make a complaint or to report misconduct. Asking for the meeting was a great professional risk, because she knew that Blanco and Najera had a close relationship, and because she knew that Jose Lopez controlled the Inland Department team in El Salvador through his control of Najera and Blanco.

172.   In the meeting, Ms. Doe told Najera that she did not feel safe traveling to Jacksonville, Florida with Blanco in January of 2018. Ms. Doe then told Najera, "*I am afraid to travel with Juan to Jacksonville, because he has always been highly inappropriate with me and with the team in general, and I am scared that he will try to do something to me in Jacksonville when I'm alone with him*."

173.   In response, Ms. Najera was completely dismissive and told Ms. Doe that she did not have to spend the entire two weeks in Jacksonville with Blanco, because she could simply use taxis or ride-hailing apps such as Uber to move

around the city without relying on Blanco for transportation away from the hotel he had chosen for her.

174.   Ms. Doe thought Najera's comment was ridiculous and intentionally oblivious to the real sense of fear and danger she was expressing. Ms. Doe also knew that from the small salary Crowley was paying her, taxi fares in the United States would be exorbitantly and prohibitively expensive, and that Blanco would likely attempt to control all of her movements while in the United States.

175.   Ms. Doe then explicitly told Najera that her concerns about Blanco went beyond her fear that he might sexually attack her in Jacksonville. Ms. Doe told Najera that she did not ever feel safe around him, in any place, including in the Crowley office.

176.   Najera abruptly cut her off and told Ms. Doe that if she did not feel safe traveling with Blanco on the business trip, or feel safe being around Blanco in the office, she could find a new job. Ms. Doe was speechless. Najera then stared at Ms. Doe for a few moments before saying, "*Can I help you with anything else?*"

177.   After leaving the conference room, Ms. Doe stood alone in the hallway for a few minutes, feeling distraught and dumbfounded. Requesting the meeting with Najera and voicing her dire concerns for her safety around Blanco had required a great deal of courage. But she had not been taken seriously, and Najera threatened

to terminate her employment with Crowley if she continued to speak up about Blanco.

178. From the manner in which Najera trivialized Ms. Doe's fears about Juan Blanco and delivered the ultimatum about finding another job, it was clear to Ms. Doe that she did not have any choice other than to go on the business trip if she wanted to keep her job.

179. Ms. Doe had already seen Blanco, Lopez, and Najera fire "L," and she knew they had the power to do the same to her for any reason.

180. Ms. Doe was very upset and told her boyfriend that her safety concerns had not been taken seriously by Crowley. She told her boyfriend that if she did not go on the trip to Jacksonville with Blanco, she would get fired from Crowley. Together, they agreed to dip into their joint savings to gather approximately $600 so that Ms. Doe could pay for taxi or Uber rides in Jacksonville in order to avoid being alone with Blanco during the trip.

## XXIII. December 20, 2017: Three Weeks Before Blanco Sexually Attacks Ms. Doe in Jacksonville, Senobia Matute (HR Director for Central America) Delivers a Highly Disturbing Draft Investigation Report to Tiffany King Recommending "*Immediate Actions*" Be Taken Against Juan Emilio Blanco.

181. On December 20, 2017 at 10:22PM Crowley HR Director for Central America Senobia Matute emailed Crowley Global HR Director Tiffany King a draft investigation report conducted in response to three HR complaints made

against Blanco by his subordinates in Crowley's Inland Department via Crowley's EthicsPoint® web platform (Case #'s 280, 282, and 283).

182.   Matute's short message to King was, "*For your revision and discussion. SM.*" The attached Word document was titled "*Ethics Point Investigation Report.*" The December 20, 2017 email from Matute to King, as well as the Investigation Report are attached hereto as "**Exhibit 8.**"

183.   In her December 20, 2017 Investigation Report, Matute wrote, "*On December 12 and 13th I met with Trucking Group Employees reporting to Juan Blanco. I interviewed a total of 12 employees out of 13.*" Matute also wrote, "*Luis was the only person I couldn't talk to since he was on vacation and not reachable.*" **Exhibit 8**.

184.   Deception and dishonesty on the part of Matute, Najera, and other Crowley HR and "Ethics" personnel was part of a company-wide pattern of behavior. For example, Matute wrote in her December 20, 2017 Investigation Report that she intentionally misled the Inland Department team members in the San Salvador office about the true purpose of her visit to their office, as well as the true purpose for her interviews with them. Instead of telling the team members she was there to investigate Blanco after Crowley had received 3 ethics complaints against him, in her Report, Matute wrote: "*The objective explained to the employees was that this is a common HR practice to meet with employees who occasionally sees, to*

*generate confidence and trust and get to know them better. Confidentiality was guarantee of what they shared during our meeting.*" **Exhibit 8**.

185.   But confidentiality of what was shared by Inland Department team members during meetings with Matute was anything but guaranteed, as Matute herself acknowledged in her Investigation Report. In her Report, Matute wrote that Blanco was in the office while the investigation was taking place, and that Blanco was intimidating witnesses and actively tampering with Matute's investigation. Matute wrote, "*He [Blanco] gave instructions that after being interviewed by me, they [the Inland Department subordinates] had to give him [Blanco] the report on what I asked and the answers they gave.*" **Exhibit 8**.

186.   Regarding Jose Lopez, who was Blanco's supervisor, in her December 20, 2017 Investigation Report, Matute wrote, "*Part of the group have the perception that Jose Lopez (Juan Blanco's Supervisor) might be aware of some of the situations…and they don't feel he will take actions with Juan Blanco since they [Blanco and Lopez] are very close.*" **Exhibit 8**.

187.   Regarding Jose Lopez, Matute also wrote, "*One of the female employees mentioned that JB [Juan Blanco] have made inappropriate comments in front of Jose Lopez, and he [Jose Lopez] only laughs.*" **Exhibit 8**.

188.   Regarding Blanco, Matute wrote, "*Female staff reported that Juan Blanco makes inappropriate jokes and sexual comments. They were very explicit on the*

comments he makes to them. They feel offended and harassed. They have been afraid of losing their jobs. Two mentioned that this was reported to local HR." **Exhibit 8**.

189.   Regarding Blanco, Matute wrote, "*Several people reported that Luis Santamaria was bullied by Juan Blanco…They said that Luis is constantly offended by Juan Blanco's comments.*" **Exhibit 8**.

190.   Regarding Blanco, Matute wrote, "*Here are some of the literal comments and inappropriate things he [Blanco] has told the employees [when] Referring to other co-workers*:

191.   "*Blanco calls female Crowley Nicknames of Pornstars, he said: 'she looks like a pornstar.'*" **Exhibit 8**.

192.   "*He calls Carla Seran 'Fuck face.'*" **Exhibit 8**.

193.   "*He frequently said on Friday, for all of you [today] is 'Viernes de Puterias' [meaning] 'For you today is Slutty Friday.'*" **Exhibit 8**.

194.   "*Other girl got flowers from her boyfriend, and he said: 'Prepare your throat for tonight, you have to pay the price of those flowers'*" **Exhibit 8**.

195.   "*When one of them came with a ponytail, he said: "I am sure you like it that way and your boyfriend too, it's easier to grab you"* **Exhibit 8**.

196.   "*He also has mentioned that boyfriends like to put their girls on their knees.*" **Exhibit 8**.

197.   *"He does comments insulting homosexuals and refers to Luis, calling him in a denigrated way. Employees reported this is very constant with Luis."* **Exhibit 8**.

198.   In her December 20, 2017 Investigation Report, Matute concluded, *"There is an evident problem with Supervisor Juan Blanco. The comments that female personnel shared, are out of order and don't comply with our Crowley's values and culture. Immediate actions need to be taken with Juan Emilio Blanco. He does not comply with the values that Crowley promote."* **Exhibit 8**.

199.   Tragically, neither Tiffanny King, nor anyone else at Crowley, heeded Matute's warning, and a few weeks later, Blanco and Crowley transported Ms. Doe to the United States with Blanco on a DFTS training trip.

200.   If King had taken *"Immediate Actions"* against Blanco, as Matute's report recommended, Ms. Doe would have been spared the horror of being trafficked to the United States where she was sexually attacked by a man Crowley had been repeatedly warned about—a man even Crowley's own HR Director had told the company was a sexual predator who presented an *immediate* danger to other Crowley employees.

## XXIV.   January 2018: Blanco Sexually Attacks, Assaults, and Terrorizes Ms. Doe on a DFTS Training Trip from El Salvador to Jacksonville.

201.   On Sunday January 7, 2018, Ms. Doe flew from San Salvador, El Salvador to Jacksonville, Florida with Blanco and another Crowley employee named Ricardo.

202.   Ms. Doe stayed at the Hotel Indigo Deerwood Park in Jacksonville, Florida. Crowley empowered Blanco to personally choose the hotel where Ms. Doe stayed in Jacksonville, and Ms. Doe was allowed no input on the decision. Upon arrival from the airport in Blanco's rental car, Blanco presented hotel staff with a Crowley corporate credit card to secure the rooms for Ricardo and Ms. Doe.

203.   Before the trip to Jacksonville, Jose Lopez told Ms. Doe during a conference call that Blanco was experienced in travel to Jacksonville and that Ms. Doe should "*do whatever Juan says*."

204.   Ms. Doe was never told that Crowley had a Corporate Travel Manual, nor was she told to follow the policies and procedures of the Corporate Travel Manual. When she arrived in Jacksonville, Ms. Doe was not even given an access card to gain entry to Crowley's corporate headquarters in Jacksonville, FL and was required to wait for Blanco each time before entering Crowley's headquarters for DFTS training. Crowley had ensured that Ms. Doe was totally dependent on Blanco and controlled by him during her time in Jacksonville.

205.   The DFTS training took place at Crowley's headquarters and generally lasted from about 8AM to 5PM. There were typically 3 Crowley employees conducting the DFTS training sessions Ms. Doe attended, with one of the trainers typically sitting in the audience. Including Ms. Doe, there were approximately 12-15 Crowley employees and contractors in attendance at the DFTS trainings.

206.   Every morning, Blanco arrived at the Hotel Indigo where Ms. Doe and Ricardo were staying, picked both of them up in his rental car, and drove them to Crowley headquarters for the DFTS training. At the end of the day, Blanco drove Ms. Doe and Ricardo back to the Hotel Indigo. During these car trips, Blanco frequently made inappropriate sexual comments to Ms. Doe.

207.   On or about the afternoon of Friday January 12, 2018, the first weekend of the Jacksonville business trip, Blanco's wife Caro invited Ms. Doe and Ricardo to dinner at Caro's house in Jacksonville. By that time, Caro, who was still employed by Crowley, had moved to from El Salvador to Jacksonville and was living in Jacksonville permanently.

208.   Ms. Doe did not want to attend the dinner and did not want to spend any more time around Blanco. However, Blanco insisted that she attend the dinner and repeatedly refused her requests that he drive her back to her hotel. Because Jose Lopez had instructed Ms. Doe to "*do whatever Juan says*," because Caro was also insisting that Ms. Doe attend the dinner, and because Crowley had purposely not given Ms. Doe her own rental car or other means of transportation, she was dependent on and controlled by Blanco and felt pressured to go to Caro's home for dinner.

209.   The group departed Crowley headquarters at approximately 4:45PM on January 12, 2018 and arrived at Caro's house at approximately 7:20PM. On the

way to Caro's home, Blanco was driving, and he stopped at a store to buy wine, whiskey, and beer. The house where Blanco drove the group was located in Vilano Beach, Florida—south of Jacksonville near St. Augustine, Florida.

210.  Once arriving at the home, Blanco and Ricardo began to consume alcohol, primarily whiskey. Blanco told Ms. Doe that he had purchased wine for her and Caro. Over the next few hours Ms. Doe witnessed Blanco and Ricardo drink large quantities of alcohol and saw that both became highly intoxicated. At some point that evening, Ricardo became so intoxicated that he passed out and went to sleep.

211.  Given the sexual threats that Blanco had made to her in El Salvador regarding his intention to "get her drunk," as well as the persistent and outrageous pattern of workplace sexual harassment Blanco had directed at her and her co-workers, Ms. Doe was terrified of drinking around Blanco. In Caro's home, she pretended to drink the wine served to her, and would occasionally take her glass into the bathroom and pour the wine into the sink or toilet. Throughout the course of the evening, Ms. Doe consumed less than one glass of wine in total and was never intoxicated.

212.  After Ricardo passed out, Ms. Doe continued speaking with Caro while Blanco primarily focused on drinking whiskey while occasionally interjecting to voice negative and demeaning comments about various Inland Department team members.

213.   Shortly before midnight, approximately 30 minutes after Ricardo passed out, Caro excused herself by saying that she was going to the bathroom, leaving Blanco and Ms. Doe alone on the house's outdoor terrace, which faced the street.

214.   Ms. Doe was seated in a chair at a small table on the terrace, while Blanco was standing across from her. As soon as Caro left them alone, Blanco demanded that Ms. Doe give him her cell phone, which he believed contained "the naked pictures you send your boyfriend." Ms. Doe was shocked, terrified, and refused to show Blanco her phone.

215.   Ms. Doe denied that her phone contained explicit sexual pictures of herself and refused to give Blanco the phone. However, Blanco continued to badger Ms. Doe, demanding that she give him her phone so that he could look at nude pictures of her.

216.   Blanco then told Ms. Doe "you are delicious." When Ms. Doe remained silent and did not respond to Blanco's sexual remark, Blanco became menacing and threatening and again demanded to see nude photos on Ms. Doe's phone. Ms. Doe again refused to give Blanco her phone.

217.   Blanco then began intrusively and threateningly staring at Ms. Doe's lips, then slowly and deliberately diverted his eyes down to her crotch in a manner that made Ms. Doe feel very uncomfortable and afraid. Ms. Doe was terrified, and she felt that Blanco intended to attack her.

218.   Suddenly, Blanco lunged down toward Ms. Doe, who was still seated. He grabbed her and attempted to wrestle her phone away from her. Ms. Doe leaned back in her seat and quickly placed her phone behind her back. Blanco pressed his crotch into Ms. Doe's face, and Ms. Doe, in terror, struggled to stand up and fight him off.

219.   As Ms. Doe struggled to stand up from her chair, Blanco pressed himself against Ms. Doe's breasts and torso. When she was able to stand up, Blanco pushed her backward and pinned her up against a wall where he continued to attack Ms. Doe, forcing his chest into her face and his crotch against her body while he groped and fondled her breasts and buttocks as he pretended that he was attempting to gain possession of her phone.

220.   As Ms. Doe struggled to resist these repeated sexual batteries, she was terrified and knew that Blanco would not stop. With Ms. Doe pinned against the wall, with his body pressed against her own, Blanco continued to fondle and grope Ms. Doe's breasts, torso, and buttocks while he spoke to her. Blanco told her that he was attractive, and she was attractive, and he said, "*I'm your supervisor, and I can fuck anyone I want*."

221.   Pinned against the wall by Blanco's much larger body, with Blanco continuing to grope and fondle Ms. Doe under the pretense of attempting to rip her

phone from her hands, Ms. Doe begged Blanco to stop and repeatedly told Blanco that she had a boyfriend.

222.   In the midst of this terrifying and prolonged struggle against her attacker, Doe and Blanco heard Caro suddenly approaching the terrace from inside the home. As Caro began to slide the terrace door open, Blanco abruptly stopped the assault and jumped back away from Ms. Doe.  Ms. Doe was shaking and in shock.

223.   As she stood shaking in terrified silence on the terrace, Ms. Doe knew that if Caro had not returned from inside the home when she did, she would have continued to be sexually assaulted and likely raped by Blanco.

224.   Because it was then after midnight, and Ms. Doe was nearly an hour away from her hotel in Jacksonville, she was forced to spend the night at Caro's home under the same roof as her attacker.

225.   The bedroom where she was sleeping had 2 doors. One led to the interior of the house, and the other door led out to the terrace. From the terrace there was a sliding door that entered the dining room, and also a door with a handle that entered a bedroom. Caro and Blanco told Ms. Doe that she would be sleeping in that bedroom.

226.   Ms. Doe was terrified that Blanco would come into to her room and rape her during the night. For security, she jammed a chair under the door handles of both doors and wedged the chairs against the doors so that Blanco could not gain entry.

227.   After Ms. Doe placed the chairs against the doors, she collapsed on the bed and began crying. She could not sleep that night, but instead stayed awake and vigilant. During the night, Ms. Doe saw Blanco out on the terrace, and then witnessed him attempting to open the door leading into Ms. Doe's bedroom. He could not open the door because of the chair Ms. Doe had wedged in front of the door.

228.   Later, Ms. Doe also heard Blanco trying to open the opposite door that led into the interior hallway. Blanco was trying to be very quiet, and Ms. Doe assumed that was because he did not want to wake Caro. Ms. Doe was alone, completely vulnerable, and terrified.

229.   The next morning after Caro awoke, Ms. Doe left the bedroom and entered the dining room. Blanco would not look Ms. Doe in the eye and was strangely and uncharacteristically quiet. Ms. Doe felt extremely uncomfortable and vulnerable and told Caro she was not feeling well in attempt to avoid a confrontation with her boss and his wife. She was so shaken that she could not eat breakfast, and the only thing she wanted to do was to return to her hotel.

230.   On Sunday, Ms. Doe told Ricardo that Blanco had been extremely inappropriate with her the night before but was afraid to tell him the full extent of what she had endured. Ricardo apologized for getting drunk, passing out, and not

being available to protect Ms. Doe at Caro's house. Ricardo also promised Ms. Doe that he would protect her from Blanco during the remainder of the trip.

231.  All during the next week of DFTS training, Ms. Doe felt intense pressure in her chest, and often wondered if she were on the verge of having a heart attack. Each morning she was forced to ride with Blanco from her hotel to Crowley headquarters for training, and each afternoon forced to ride in Blanco's car to return to her hotel. The constant apprehension of close quarters contact with her boss, controller, and attacker left her on the verge of panic attacks.

232.  During car rides and during DFTS trainings at Crowley headquarters, Blanco continued to make outrageous sexual comments to Ms. Doe, and comments specifically about her own personal sexual life. During the DFTS training sessions at Crowley headquarters, Blanco would turn around during trainings, ignoring the material being covered, to stare threateningly at Ms. Doe to intimidate her into silence about the way he had behaved toward Ms. Doe at Caro's home. When Ms. Doe informed Ricardo of Blanco's actions, Ricardo began to place his own body as a shield between Ms. Doe and Blanco.

233.  Finally, the two weeks of DFTS training ended and the time arrived for Ms. Doe to fly back to El Salvador. On the final day, Ms. Doe intentionally missed her flight to avoid traveling back to El Salvador with Blanco.

234.   Ms. Doe returned from Jacksonville to El Salvador on a later re-booked flight on Saturday January 20, 2018. Her firm intention was to quit her job at Crowley when she returned to El Salvador.

235.   She knew that Crowley did not care about her safety and that the company never would. She had already formally complained to Crowley HR and warned the company about Blanco, but they did nothing, so she felt she had no choice other than to try to find a new job.

236.   Ms. Doe felt overwhelmed with conflicting emotions. She felt paralyzed as to how and what to tell her boyfriend. She thought everyone was going to blame her and shame her if she talked about what Blanco had done to her in Jacksonville. She felt guilty for going to Caro's house in the first place, even though she had been forced to go.

### XXV.   Upon Her Return to El Salvador from Jacksonville, Ms. Doe Files a Report With Crowley via EthicsPoint® Regarding What She Endured at the Hands of Known Sexual Predator Blanco.

237.   When her boyfriend picked her up at the airport in San Salvador on January 20, 2018, Ms. Doe was fighting back tears as she struggled to tell him about Blanco attacking her and then the ensuing night of terror she endured as Blanco attempted multiple times to enter her bedroom.

238.   However, Ms. Doe knew that her boyfriend owned a firearm, and she worried that her boyfriend might try to kill Blanco if he learned the full extent of

what Blanco had done to her. Her concern was not for Blanco's safety, but rather that her boyfriend might get in legal trouble. This concern caused her to downplay to a certain extent what she had been through in Jacksonville. However, she could not hide how she was feeling.

239.   Inside of her boyfriend's truck in the parking lot at the airport, Ms. Doe believes she had a severe panic attack that included difficulty breathing, and she became overwhelmed by feelings of doom and a feeling that she might pass out.

240.   Based on what Ms. Doe told him about what Blanco did to her in Jacksonville, her boyfriend encouraged her to use Crowley's EthicsPoint® platform to report Blanco, but Ms. Doe was hesitant and afraid. When Ms. Doe went to work on Monday January 22, 2018 at Crowley's San Salvador office, she told a manager from a different department some of what had happened in Jacksonville, and this Crowley manager also told her to report Blanco to Crowley via EthicsPoint®. Ms. Doe also saw Blanco in the office that day, and she was sickened and infuriated by the sight of Blanco walking around, making the same outrageously inappropriate comments, and acting in the same way he always did—fully confident in his own power and invincibility.

241.   Ms. Doe called in sick to work on Tuesday January 23, 2018, because it was impossible for her to work in the same office as the man who had trafficked and sexually attacked her. She had no intention of ever returning to the Crowley office

or ever seeing Blanco again and thus felt that she had nothing to lose by making a formal report against Blanco. Because her boyfriend was sitting beside her when she logged on to Crowley's EthicsPoint® web platform and while she typed out the report, Ms. Doe again held back some details of what she had endured out of concern that her boyfriend would commit an act of violence against Blanco. Nonetheless, the report she did file via Crowley's EthicsPoint® platform was comprehensive, powerful, damning, and horrifying. Ms. Doe's report against Blanco was assigned EthicsPoint® Case #297 within Crowley, which is attached hereto as "**Exhibit 9.**"

242.   In Crowley EthicsPoint® Case #297 Ms. Doe wrote that she was reporting her supervisor Juan Emilio Blanco. She wrote that the specific incident she was reporting had occurred on the evening of January 12, 2018. She also wrote, "*Before starting to describe my complaint, I would like to express how frustrated I feel at this point. I reported Juan['s] behavior in the past and his behavior has not changed at all since then. I'm extremely close to quit[ting] and get[ting] another job, [I'm] 90% sure of doing that and the only 10% that keeps me from doing it is a little hope I have by creating this report...To start, I would like to mention that Juan has not stop doing sexual comments about the girls from our department and the surrounding departments, he keeps calling them by porn star's nick names, sometimes they hear it, sometimes they don't, but this is not really why I'm*

*submitting my report... I was on a training trip with him and another co-worker in Jacksonville, FL facilities (we left on 01/07 and came back on 01/20). On 01/12 evening, Juan's wife invited us to have dinner and stay (me and our co-worker). After dinner Juan and my co-worker started drinking a lot, while me and Juan's wife were talking. Later during the night our co-worker left to his own bedroom and Juan's wife stood up for a moment and went to a different room, leaving Juan and myself on the table. All of a sudden, he started asking me to show him pictures of myself, which I refused, and he attempted to grab my phone by force. I managed to stop him and then he looked at me and told me that I was really good looking and since he was the supervisor, he could have sex (he actually said he could fuck) with whoever he wanted. He told me that I was attractive and he was attractive too and now I knew what a supervisor can do (Is this really what supervisors are allowed to do? do they get this on their manual as part of the benefits of working in this company? or do they get any kind of training on this?), at this point I was in shock and told him that was inappropriate then started talking about my boyfriend to distract him from the topic. After about 10-15 min his wife came back and said it was already getting late so I immediately stood up and went to the room they had designated for me, I locked it and as soon as I laid down I started to cry. The next day, he wanted for us to stay at his house again but I refused, he told me that if it was that urgent he could take me to the hotel after midnight (was he looking for an*

*opportunity to do something? part of the things he can also do as a supervisor perhaps?), I stood my ground and managed to have him take my coworker and me back to the hotel… The only reason why WE (MY CO-WORKER AND I) accepted his wife's invitation to come over to their place is because we understood that as hospitality and like one of ANY of the invitations we got from the rest of the personnel in US (going out at night to eat). I personally never thought he was pretending to make these extremely uncomfortable comments or take this to a worst scenario, I would have NEVER gone there and again, I'm extremely upset about this. I can't believe the stress and anxiety I get just by looking at his face and thinking that he sees me as a sex opportunity or being a potential victim of any other sexual offense, I can't stop crying since I started typing this. The following week [during DFTS Training] I blocked the event in my head because I wanted no distractions during [DFTS] training. When we came back to El Salvador I still had not processed what had happen until today that I saw him at work. **I seriously can't work with a sex offender and even worst having him as my supervisor**. I really hope to ring some bells and get a resolution to this problem before I find another job and lose that 10% of hope and trust I still have in this company. I really love my job and I really like what I'm doing, I like the company and I do believe that this is a place where I can grow and make a career in (I have even*

*make sacrifices to work here, such as not taking school due to schedules) but there is no way that I share every day with a sexual offender."* **Exhibit 9**.

XXVI.   **In Response to Ms. Doe's EthicsPoint® Report #297, Crowley Finally Decides to Fire Juan Emilio Blanco After Crowley HR Leader Tiffany King Concludes "*We Can't Afford to Have Another Complaint About Juan. It Appears that We Aren't Taking the Employee Complaints Serious.*"**

243.   After being attacked by Blanco in Jacksonville, Ms. Doe submitted her complaint against Blanco via EthicsPoint® on January 23, 2018 at 7:30PM. The report, assigned Case #297, was immediately received by VP of Ethics Arthur LaMoureaux, Crowley's Global Director of Human Resources Tiffany King, Melvin Dodson, Zoraida Jirau, Crowley's Director of Ethics and Compliance Greg Kencitzski, Senobia Matute, Susan Michel, and Heitzel Monroy. **Exhibit 9**.

244.   At 7:39PM, only nine minutes after Ms. Doe submitted her report for Case #297, Tiffany King sent an email to Senobia Matute with the subject line, "*FW: New Case (#297) – Sexual Harassment*." King's January 23, 2018 email is attached hereto as, **Exhibit 10**.

245.   King had *not* heeded Matute's warning, issued more than a month earlier on December 20, 2017, that "*Immediate Actions*" needed to be taken against Juan Blanco. However, King was now calling for action—not to protect female employees from a sexual predator—but to protect Crowley's reputation from "*another complaint*" the company couldn't "*afford*." **Exhibit 10**.

246.   In her email to Matute, King wrote, "*This is a new Ethics Point complaint about Juan Blanco. Has Jose [Lopez] confirmed his availability to travel to El Salvador next week? If not, I would like to proceed with the termination this week and Jose can participate by phone. We can't afford to have another complaint about Juan. It appears that we aren't taking the employee complaints serious. Can we discuss our plan tomorrow morning? If needed, I will get Bob Weist involved to expedite this. Thanks*." **Exhibit 10.**

247.   The next day, on January 24, 2018, Tiffanny King sent an email to Heitzel Monroy with the subject "Juan Blanco Termination." King wrote, "*Senobia and I met this morning to discuss the immediate termination of Juan Blanco. Jacqueline Najera will conduct the termination discussion with Jose Lopez and Senobia on a conference call. The termination conversation will take place at 3:00pm today in El Salvador. I will contact the reporter [Ms. Doe] once the termination discussion is completed. Tiffanny King.*" King's January 24, 2018 email is attached hereto as, **Exhibit 11**.

248.   The next day, on January 25, 2018, Tiffanny King updated EthicsPoint® Case #297 (Ms. Doe's) to reflect the fact that Blanco had been terminated. "*Conversation conducted with reporter [Ms. Doe],*" King wrote. "*Advised Juan Blanco was the subject of other cases and an investigation was recently completed by the HR team resulting in his termination. I shared my appreciation for speaking*

*up and informed the reporter she can contact me in the future. Investigation closed.*" **Exhibit 9**.

249.   According to King's note, as well as Ms. Doe's recollection of their conversation, Tiffanny King misled Ms. Doe by telling her that Crowley had already decided to terminate the employment of Juan Blanco before Ms. Doe made her report. King did not tell Ms. Doe that it was her precisely her report #297 that caused King and other high-ranking executives at Crowley to conclude the company could not "*afford to have another complaint about Juan.*" **Exhibit 10.**

250.   Ms. Doe had already decided to quit her job at Crowley, but after learning that Blanco had finally been terminated by Crowley, Ms. Doe decided to return to work at Crowley.

251.   Despite the horrific experiences they knew Ms. Doe had endured, neither Tiffanny King nor anyone else at Crowley Maritime Corporation ever offered Ms. Doe any additional support or assistance related to the trauma she had obviously incurred throughout her tenure at the Company. Crowley simply expected her and the other victims of Blanco to "deal with it."

## XXVII.   **The Aftermath**

252.   After returning to the office following the termination of Blanco's employment with Crowley, one day Ms. Doe ran into Crowley HR Director Senobia Matute, who casually thanked Ms. Doe for putting in a complaint against

Blanco. "*We took your complaint into consideration when we decided to fire Juan Blanco*," Matute told Ms. Doe.

253.   In response, Ms. Doe told Matute that she had previously warned Crowley HR Manager Jaqueline Najera that she was afraid of Blanco and afraid to travel with him. Ms. Doe further informed Matute that Najera had dismissed her safety concerns and told her that she could either go on the trip or find a new job.

254.   Then Ms. Doe told Matute, "*next time, listen to women and take them seriously.*" After making this comment, Matute remained silent and then quickly ended the conversation by walking away.

255.   Matute never apologized to Ms. Doe for what she had endured, never acknowledged the seriousness of the situation, never offered Ms. Doe assistance to deal with the inevitable trauma of suffering through such a terrifying experience, and never expressed any concern for Ms. Doe's wellbeing. Like Tiffanny King, Matute saw what happened to Ms. Doe and the other victims of Blanco only through the lens of protecting Crowley, not Crowley's employees.

256.   Soon, Ms. Doe began having nightmares about what Blanco had done to her in Jacksonville and began seeing a psychiatrist who eventually diagnosed her with Post Traumatic Stress Disorder (PTSD) from the time she spent working for Blanco and from the attack and night of terror in Jacksonville. To this day, Ms.

Doe continues to suffer from severe emotional trauma related to the events described in this complaint.

257.   After Blanco was fired, Ms. Doe recalls that Jose Lopez complained loudly and bitterly to the Inland Department team in El Salvador that Blanco had been unjustly terminated, and told Ms. Doe and others that his good friend Juan Emilio Blanco had been "*set up*" by various female employees of Crowley.

258.   This sentiment by Crowley DFTS Leader Jose Lopez that Blanco had been "*set up*" by female Inland Department employees is consistent with Lennys Campos' May 1, 2018 Investigation Report into Jose Lopez's management of the El Salvador Inland Department and DFTS teams. In that report, Campos wrote that Jose Lopez, "*blames employees for the firing of [the] team's supervisor [Juan Blanco] [in January of 2018], **[because] it creates more work for him**.*" **Exhibit 2**.

259.   After Blanco was fired, Crowley promoted Ms. Doe to a role as supervisor of the Documentation Department for the Defense Freight Transportation Services (DFTS) contract. Eventually, Ms. Doe became the supervisor of Vanessa Treminio who would later allege in a federal sex trafficking and forced labor lawsuit filed in this court in 2022 that Blanco had raped her in a hotel in Jacksonville, Florida only a few months before Blanco attacked Ms. Doe in Jacksonville on a subsequent, substantially similar Crowley-sponsored DFTS training trip.

260.   Ms. Doe remembers a day in early to mid-2018 when Crowley employees from the Jacksonville and Puerto Rico offices arrived in El Salvador to check on progress around the implementation of the DFTS contract.  At one point, one of the male employees from Puerto Rico pulled Ms. Doe aside and quietly said, "*How is Vanessa doing? I know about Blanco.*"

261.   When Ms. Doe heard the man say, "*I know about Blanco,*" Ms. Doe got chills in her body. Even though the man had mentioned Vanessa, Ms. Doe thought he was referring to the attack and night of terror Ms. Doe herself had endured at Blanco's hands in Jacksonville.

262.   But then the man added, "*Just keep an eye on her mental health.*" With the additional comment, Ms. Doe realized the man meant he knew Vanessa Treminio had also been the victim of serious sexual abuse by Blanco. This information shocked Ms. Doe and left her wondering how many other women at Crowley may have been attacked by Blanco during his nearly 8 years with the company. She also wondered how many other people at Crowley had known all along that Blanco was a sexual predator, yet did nothing to limit his contact with female employees or take concrete steps to stop him.

263.   After Blanco was fired on January 24, 2018, Lennys Campos became the new DFTS Manager and worked from Crowley headquarters in Jacksonville. But Jose Lopez still controlled the Admin team in El Salvador from his own office in

Jacksonville, and the toxic, abusive, misogynistic, and exploitative office and work culture that Lopez had carefully cultivated, and that Crowley had condoned and enabled over the course of years, did not change because of Blanco's termination.

264.   In April of 2018, Campos was sent from Jacksonville to the San Salvador office to investigate ongoing issues and complaints related to Lopez's management of the team in El Salvador. As part of her investigation, Campos held "one-on-ones" with many of the Crowley employees working in the Inland Department and on the DFTS contract.

265.   During her one-one-one meeting with Ms. Doe, Campos specifically asked Ms. Doe if she had any negative experiences with Blanco. In response, Ms. Doe told Campos that Blanco had been sexually inappropriate toward her from the first day she worked for him until the last day.

266.   During their one-on-one, Campos told Ms. Doe that she had been sent to El Salvador specifically to interview employees about their experiences with Juan Blanco and Jose Lopez, and Campos told Ms. Doe she was shocked by the stories of abuse she had heard from the victims of Blanco, Lopez, Najera, and other Crowley employees. "*When I get back to Jacksonville, I'm going to have to write a very long email about all of this*," Campos told Ms. Doe.

267.   On May 1, 2018, less than two months before Jose Lopez announced his "resignation" from Crowley, and following her investigatory trip to the San

Salvador office, DFTS Manager Lennys Campos delivered an investigation report to Tiffanny King and Bob Weist, Crowley's Vice President (VP), North America Transportation, regarding Lopez's management of the El Salvador Inland and DFTS departments." Jose Lopez reported directly to Weist, Lopez had reported directly to Weist for years, and Weist was ultimately responsible for the pattern of abuses described in Campos' report.

268.   The formal report Campos delivered to King and Weist was titled "*DFTS [Defense Freight Transportation Services] RSM [Revenue Settlement Management] El Salvador Team Trip Report*." **Exhibit 2**.

269.   According to Campos' May 1, 2018 Trip Report, "*Jose Lopez has made sexist comments…when he wanted to hire a supervisor, Jose Lopez mentioned that he only wanted to interview men and that he did not want to interview women.*" **Exhibit 2**.

270.   According to Campos' May 1, 2018 Trip Report, "*Many [female] employees of Shared Services El Salvador would like to apply for the position of Trucking Brokerage supervisor but do not apply because Jose Lopez looks down on women*." **Exhibit 2**.

271.   According to Campos' May 1, 2018 Trip Report, Jose Lopez told Inland Department and DFTS team members that "*women do not deserve to be supervisors or managers, [and] should not aspire to higher positions because they*

*are too emotional, dumb, will embarrass him [and he is] sure that [a woman]*
*won't do a good job*." **Exhibit 2**.

272.   According to Campos' May 1, 2018 Trip Report, "*One of the [team]*
*members commented that he knows Mario Granada [Juan Blanco's replacement]*
*from another workplace…He realized that his sister worked in the same account*
*with Mario, and in fact she was a victim of sexual harassment by him.* ***She***
***additionally commented that she had reported this [sexual harassment] to Jose***
***Lopez in private...in a conference room and Jose Lopez did not listen to her and***
***got angry and asked her to leave the conference room***." **Exhibit 2**.

273.   According to Campos' May 1, 2018 Trip Report, "*Jose Lopez has told*
*Mario and Pedro [the Supervisors] all the [misconduct] accusations that have*
*been filed [against them by Inland Department and DFTS team members] and*
*[Lopez] has warned them that they [HR/Ethics] will be investigating them*."
**Exhibit 2**.

274.   According to Campos' May 1, 2018 Trip Report, employees were "*afraid of*
*retaliation from Jose Lopez,*" employees heard other employees make complaints
and saw "*nothing has been done,*" employees were "*afraid to formally complain or*
*report issues/behavior,*" employees were "*afraid Crowley HR might disregard*
*complaints/issues (e.g., situation with Juan Blanco),*" because "*Management/HR*

are friends with Jose Lopez," employees also said they "*felt ready to give up*," felt "*defeated*," and noted that it "*took courage to ask to speak to someone*." **Exhibit 2**.

275. According to Campos' May 1, 2018 Trip Report, employees felt "*stressed/pressured," were "fearful of retribution,*" felt "*ignored, defeated, demoralized, degraded, disrespected, frustrated, disappointed with leadership & HR [&] employee assist/ethics line [and] expressed interest in [the] opportunity to move to another Crowley position [in order] to leave [Lopez's] ADMIN group.*" **Exhibit 2**.

276. According to Campos' May 1, 2018 Trip Report, "*Jose Lopez (manager) create[s] and contribute[s] to a toxic work environment, used aggressive, offensive, and profane verbal language...Berating, yelling, cursing [at] team members (also described as bullying)...Retaliate[d] after employees raised issues/concerns...established and kept PIPs [Performance Improvement Plans] without proper follow up and use[d] [PIPs] to disqualify employee from raises, promotions, or job transfer opportunities...[was] dismissive, condescending, excluding/segregating and isolating women...[and] behaved unprofessionally and disrespectfully.*" **Exhibit 2**.

277. Again, According to Campos' May 1, 2018 Trip Report, "[Jose Lopez] blames employees for the firing of [the] team's supervisor [Juan Blanco] [in January of 2018], **[because] it creates more work for him**." **Exhibit 2**.

278.   In the early months of 2018, following her alleged rape by Blanco, Ms. Doe's then-subordinate, Vanessa Treminio, began to suffer severe emotional distress that had a tremendous negative impact on her emotional state and job performance. By June of 2018, Mrs. Treminio's emotional state had deteriorated to the point that Ms. Doe was required to hold a formal "one-on-one" meeting with Mrs. Treminio to discuss the emotional problems and deteriorating mental health Treminio was experiencing and how she could improve.

279.   According to Crowley's own HR records obtained by Mrs. Treminio via her ongoing sex trafficking and forced labor lawsuit against Crowley, in early 2018, following her alleged rape by Blanco, Mrs. Treminio's personality had completely changed, and she had begun frequently bursting into tears in the office and experienced "*strong emotional breakdowns requir[ing] significant supervisory intervention*."

280.   The "one-on-one" intervention with Mrs. Treminio was conducted in a conference room in the El Salvador Office. Ms. Doe and Mrs. Treminio were physically present in the room, while Lennys Campos, who was Ms. Doe's supervisor, was present via speaker phone.

281.   During her one-on-one, Mrs. Treminio told Ms. Doe and Campos that she was a recent victim of sexual abuse, and explained to Campos and Doe that the trauma from the sexual abuse was the reason she had suddenly begun suffering

such serious emotional problems. When the meeting concluded, Lennys Campos hung up, and it was only Ms. Doe and Mrs. Treminio left in the meeting. Ms. Doe then asked Mrs. Treminio if it had been Juan Blanco who had abused her. Mrs. Treminio responded that, yes, it was Blanco. In response, Ms. Doe told Mrs. Treminio that she understood, because Blanco had also done terrible things to her. Both women, survivors of Crowley-sponsored sexual abuse and sex trafficking at the hands of Juan Blanco, then hugged and began to cry together in the conference room.

## FIRST CAUSE OF ACTION
(Sex Trafficking under 18 U.S.C. §§ 1591, 1595 *et seq.*)
Against JUAN EMILIO BLANCO

282.   Plaintiff incorporates the allegations in paragraphs 1 through 281, as if fully set forth herein.

283.   In violation of 18 U.S.C. § 1591, Juan Emilio Blanco knowingly, in or affecting interstate or foreign commerce, did recruit, entice, solicit, or transport Plaintiff knowing that means of force, threats of force, fraud, or coercion (or any combination thereof) would be used to cause Plaintiff to engage in any sex act on account of which anything of value would be given to or received by any person.

284.   The statute of limitations for violations of the sex trafficking statute is 10 years. 18 U.S.C. § 1595. The Plaintiff was affected within the 10 years prior to filing suit.

285.   Juan Emilio Blanco's actions knowingly affected interstate or foreign commerce when he, while serving as Plaintiff's supervisor and while acting within the scope of his authority as an agent of Crowley, did recruit, entice, solicit, and transport Plaintiff from San Salvador, El Salvador to Jacksonville, Florida on an official Crowley business trip that involved training on the Defense Freight Transportation Services (DFTS) contract.

286.   While acting as an agent of Crowley and while acting within the scope of his authority, Juan Emilio Blanco personally selected Plaintiff for the trip to Jacksonville, Florida and personally selected the hotel where Plaintiff would stay while in Jacksonville. Blanco then secured Plaintiff's hotel room in Jacksonville using a Crowley corporate credit card issued to Blanco by Crowley. These actions by Blanco were ratified and approved by Crowley.

287.   When Blanco recruited Plaintiff to accompany him on the international business trip, he did so knowing that he would use force, threats of force, fraud, coercion, or a combination thereof—as he had previously done with other vulnerable female Crowley employees (including Vanessa Treminio)—to sexually attack Plaintiff after isolating her in the United States.

288.   Juan Emilio Blanco knowingly coerced Plaintiff into his scheme when he conspired with Crowley HR Manager Jaqueline Najera, senior manager Jose Lopez, Crowley VP Bob Weist, Crowley VP of Ethics and Compliance Arthur

LaMoureaux, and other Crowley agents and employees in the United States to use coercion and threats of serious harm to force Plaintiff to travel from San Salvador, El Salvador to Jacksonville, Florida for the official business trip. The threats of serious harm and coercion tactics were directly applied to Plaintiff by Blanco, Crowley HR Manager Jaqueline Najera, and others.

289.  Ms. Doe expressed apprehensions and protestations to Crowley employee and agent Jaqueline Najera prior to the January 2018 business trip because she did not feel safe traveling with Blanco and was afraid he might sexually attack her while in the United States.  Nevertheless, Blanco knew from experience, and from his participation in an active and ongoing conspiracy between Blanco, Najera, Jose Lopez, Bob Weist, Arthur LaMoureaux, and other Crowley employees and executives, to suppress reports of sexual misconduct committed by Blanco and to retaliate against victims who tried to report and stop Blanco's sexual misconduct, that Najera and other Crowley employees and agents would use coercion and threats of serious harm on his behalf to force Ms. Doe to participate in Blanco's scheme.

290.  Blanco's actions in conspiring with Najera and other Crowley agents and employees to coerce Plaintiff into accompanying Blanco on the international business trip caused Plaintiff to reasonably believe that her failure to travel to Jacksonville with Blanco would result in serious harm to herself. As part of that

plan, Plaintiff was told by Najera that if she did not travel to Jacksonville with Blanco, her employment with Crowley would be terminated.

291.   As Plaintiff was a young woman earning approximately $8,000 per year in a developing country where equivalent office jobs were extremely difficult to obtain, Plaintiff reasonably feared that she would suffer serious professional and reputational harm as well as serious, potentially ruinous financial harm if she did not comply with Crowley's order to travel to Jacksonville with Blanco.

292.   In exchange for agreeing to participate in what Blanco knew was a scheme in which he would use force, threats of force, coercion, or any combination of such means, to cause Plaintiff to engage in a sex act on account of which anything of value would be given to or received by any person, Plaintiff benefitted financially and received things of great value to her.

293.   In exchange for agreeing to participate in Blanco's scheme, Plaintiff received a Crowley-sponsored 10-year U.S. travel visa that allowed her to travel back and forth to the United States. Plaintiff would never have been able to obtain this visa if she had not agreed to accompany Blanco on the trip to Jacksonville. This U.S. travel visa made her much more attractive to employers in El Salvador who also had offices or headquarters in the United States.

294.   In exchange for agreeing to participate in Blanco's scheme, Plaintiff received round-trip travel to the United States, hotel accommodations, and meals.

She also received valuable training on a large U.S. Department of Defense logistics contract (DFTS) and was able to make valuable professional connections with senior employees at her company's headquarters in Jacksonville.

295.   Plaintiff also received tangible job benefits. By complying with Crowley's order to travel to the United States with a man she warned Crowley she feared might sexually attack her during the trip, Plaintiff was allowed to continue her employment with Crowley and to continue receiving her salary and other employment benefits. Inherent in this dangerous and ultimately tragic forced-bargain, agreed to by Plaintiff only in the face of threats of serious harm and extreme duress, was the possibility of valuable career advancement within Crowley. This career advancement in fact materialized in the years following Plaintiff's sexual assault in Jacksonville when Plaintiff was promoted to manager, and then later to analyst. These promotions and the accompanying increases in salary and other tangible job benefits would not have materialized had Plaintiff not complied with Crowley's order to accompany a man Crowley knew was a sexual predator on an international business trip.

296.   In Jacksonville, Blanco sexually attacked and assaulted Plaintiff and engaged in forced sex acts with her while attacking her at his wife's home. During the attack, Blanco pressed his crotch into Plaintiff's face, pressed himself against Plaintiff's breasts and torso, pushed Plaintiff backward and pinned her up against a

wall where he continued to attack Plaintiff, forcing his chest into her face and his crotch against her body while groping and fondling her breasts, torso, and buttocks. Blanco would have continued with his sexual attack and eventually raped Plaintiff, as he had allegedly already raped at least one other female Crowley employee, had Blanco's wife not appeared on the scene amid the attack.

297. Following the sexual batteries Blanco inflicted upon Plaintiff in Jacksonville, Blanco caused Plaintiff to spend a sleepless, terror-filled night alone in a bedroom within Blanco's wife's home while Blanco repeatedly attempted to gain entry to the bedroom in order to continue his sexual attack of Plaintiff.

WHEREFORE, by virtue of these violations of 18 U.S.C. §§ 1591, 1595, Plaintiff respectfully requests this Court to enter judgment against Defendant Juan Emilio Blanco for compensatory damages, consequential damages, and punitive damages in an amount to be determined at trial, as well as interest, costs, and for such further and other relief as this Court deems appropriate and demands a trial by jury.

## SECOND CAUSE OF ACTION
(Sex Trafficking under 18 U.S.C. §§ 1591, 1595 *et seq.*)
Against CROWLEY MARITIME CORPORATION

298.   Plaintiff incorporates the allegations in paragraphs 1 through 281, as if fully set forth herein.

299.   Plaintiff asserts two theories of § 1595(a) liability against Crowley: 1) perpetrator / principal liability, 2) venture / beneficiary liability.

300.   The two theories of liability available to trafficking victims under Section 1595(a) are not mutually exclusive.

301.   The statute of limitations for violations of the sex trafficking statute is 10 years. 18 U.S.C. § 1595. The Plaintiff was affected within the 10 years prior to filing suit.

### Perpetrator / Principal Liability Claim

302.   In violation of 18 U.S.C. § 1591, Crowley did knowingly, in or affecting interstate or foreign commerce, recruit, entice, solicit, or transport Plaintiff knowing that means of force, threats of force, fraud, or coercion (or any combination thereof) would be used to cause Plaintiff to engage in any sex act on account of which anything of value would be given to or received by any person.

303.   Crowley's actions knowingly affected interstate or foreign commerce when Crowley did recruit, entice, solicit, and transport Plaintiff from San Salvador, El Salvador to Jacksonville, Florida for an official Crowley business trip that involved training on the Defense Freight Transportation Services (DFTS) contract.

304.   For years prior to the January 2018 business trip during which Plaintiff was trafficked and sexually abused by Blanco, Crowley had known that its employee and agent, Juan Emilio Blanco, was a sexual predator who had sexually harassed

and abused numerous female Crowley employees within the Crowley offices, at Crowley-sponsored events, and while transporting female Crowley employees on Crowley-sponsored international business trips. Instead of firing Blanco, Crowley moved Blanco from its Procurement Department, where he left a trail of sexual abuse victims, to Crowley's Inland Department, where Crowley knowingly allowed him to start over with a new batch of future sexual abuse victims, including Vanessa Treminio and the Plaintiff.

305.   While Blanco supervised the Inland Department, and prior to his management of the Inland Department, Crowley received numerous reports from female Crowley employees, including from Plaintiff, that Blanco had sexually harassed, sexually abused, or raped them. Most of these complaints were "covered-up" in the San Salvador office by Crowley HR Manager Jacqueline Najera, Inland Manager Jose Lopez, and others. However, some of these sexual misconduct complaints against Blanco eventually made their way into company-wide HR and Ethics complaint management systems that were managed by senior Crowley executives in the United States.

306.   Instead of taking action against Blanco or reporting him to law enforcement, Crowley, as a systematic business practice designed to maximize profits, either threatened Blanco's victims into silence, or fired them while continuing to employ Blanco, because he was a "star performer" who drove profits for Crowley, in order

to protect the company's reputation and business relationships, and because Crowley saw Blanco's victims, all of whom were Salvadoran women, as powerless second-class corporate citizens who were without access to any legal recourse against the company's abusive labor practices. Despite Crowley's knowledge that Blanco was systematically preying on its female employees, Crowley continued to condone, enable, and facilitate Blanco's repeated sexual abuse of its own female employees while knowing that his attacks would and did continue.

307.   During the week of November 13-17, 2017, when Crowley allowed Blanco to personally select Plaintiff to accompany him on an upcoming DFTS training trip to Jacksonville, Florida, Crowley knew that only days earlier, Crowley employee Vanessa Treminio had reported to Crowley—at Crowley's headquarters in Jacksonville, Florida—that Blanco had raped her in her Jacksonville hotel during a DFTS training trip on November 9 or 10, 2017.  **Exhibit 1 ¶¶ 47, 48, 49, 50.**

308.   According to Treminio's Amended Complaint, "*A young female employee from El Salvador [Treminio] walked into Crowley headquarters…distraught and in tears, complaining that her boss had raped her the night before and demanding to report the rape…It is inconceivable that knowledge of this event remained confined to Jose Lopez and one other Crowley employee. News of Plaintiff's ordeal and rape allegations likely reached the highest levels of Crowley leadership within a matter of hours.*" **Exhibit 1 ¶ 138.**

309.   In a conference room within Crowley headquarters on November 10, 2017, Crowley employee and agent Jose Lopez gaslit Treminio, threatened her, and warned Mrs. Treminio to "'*shut up' about being raped if she wanted to keep her job.*" **Exhibit 1** ¶ 50.   Treminio's experience with Lopez was not the first or only time Jose Lopez had angrily dismissed a female Crowley employee's sexual misconduct complaints against Blanco. According to Crowley employee and agent Lennys Campos' May 1, 2018 Trip Report from her visit to Crowley's San Salvador office, "*One of the [team] members…realized that his sister…was a victim of sexual harassment…She additionally commented that she had reported this [sexual harassment] to Jose Lopez in private...in a conference room and Jose Lopez did not listen to her and got angry and asked her to leave the conference room*." **Exhibit 2**.

310.   Crowley's response to Treminio's first report of being raped by Blanco— delivered to Crowley at Crowley headquarters on November 10, 2017—was to cover-up the felony sex crime allegation, assist Blanco in fleeing the United States later that same day, intentionally fail to notify law enforcement of the violent sex crime Treminio had reported to Crowley, ship Treminio off to Puerto Rico, and allow Blanco to return to the office in El Salvador so that he could select Plaintiff as his next sex trafficking victim.

311.   Crowley has admitted, under oath in a sworn document filed with this court, that prior to Plaintiff's January 2018 DFTS business trip from El Salvador to Jacksonville during which Plaintiff was sexually attacked and abused by Blanco, Crowley Vice President of Ethics and Compliance Arthur LaMoureaux received Crowley employee Vanessa Treminio's 2nd report to Crowley, in which she detailed that she had been raped by Blanco during an earlier Crowley DFTS business trip in November of 2017. **Exhibit 7**.

312.   Crowley has also claimed, under oath in a sworn document filed with this court, that the highest ranking "Ethics" executive at Crowley, a man who reported directly to CEO Thomas Crowley, decided to tell *no one* else at Crowley that he had received a formal, tearful report from a low-level Salvadoran Crowley employee being paid less than $10,000 per year, in which she alleged that Blanco had recently raped her in Jacksonville during a DFTS training trip in November of 2017. Instead, Crowley has claimed, under oath in a sworn document filed with this court, that Crowley Vice President of Ethics and Compliance Arthur LaMoureaux kept Treminio's December 2017 rape allegation "*confidential*," chose to take no action against Blanco, and chose to subsequently allow Blanco to transport Plaintiff to Jacksonville on a subsequent DFTS training trip during which she was foreseeably sexually attacked and abused by Blanco, months after Crowley first learned of Vanessa Treminio's allegations. **Exhibit 7**.

313.   On December 20, 2017, 3 weeks before Blanco attacked Plaintiff in Jacksonville, Crowley HR Director Senobia Matute delivered to Tiffanny King, Crowley's global head of HR, a damning report on Juan Blanco that clearly described Blanco as a sexual predator who terrorized female Crowley employees. In her report, Matute warned Crowley's highest ranking Human Resources executive that, "*There is an evident problem with Supervisor Juan Blanco...**Immediate actions need to be taken with Juan Emilio Blanco**.*" Tragically, neither Tiffanny King, nor anyone else at Crowley, heeded Matute's warning, and a few weeks later in January of 2018, Blanco and Crowley transported Ms. Doe to the United States with Blanco on a DFTS training trip during which she was sexually trafficked and sexually abused by Blanco.

314.   The actions and inactions of Jacqueline Najera, Jose Lopez, VP of Ethics Arthur LaMoureaux, Global HR Leader Tiffany King, and other Crowley executives, employees and agents regarding Blanco's corporate-sponsored sexual abuse of Crowley's female employees can only be described as a series of related corporate "**cover-ups**." These cover-ups were carried out by agents and employees of Crowley acting within the actual or apparent scope of their employment or authority, and were designed to protect not only Crowley employee and agent Juan Emilio Blanco, but to protect the reputation and profits of Crowley Maritime Corporation.

315.   A claim for sex trafficking under the TVPA requires that Plaintiff allege she was forced to engage in a "*commercial sex act*," defined as "*any sex act on account of which anything of value would be given to or received by any person*." In ¶¶ 290-295 of this complaint, Plaintiff states numerous "things of value" received by her in return for going on an international business trip with a man she warned Crowley had subjected her to humiliating and terrifying sexual harassment, and whom she did not feel safe traveling with on an international business trip.

316.   In addition to the above referenced things of value received by Plaintiff, Crowley Maritime Corporation also benefitted and received things of value from the trafficking of Plaintiff and her sexual abuse. Specifically, Crowley benefitted financially from the corporate **cover-up** of Vanessa Treminio's allegations against Blanco, made to Crowley in November and then again in December of 2017, that Blanco had raped Treminio in a hotel room in Jacksonville during a Crowley-sponsored business trip in November 2017. If Crowley VP of Ethics Arthur LaMoureaux handled Treminio's December 2017 rape allegations against Blanco in an ethical manner instead of keeping the allegations "confidential" as part of an obvious effort to cover-up the crime, Plaintiff would never have been trafficked and sexually abused by Blanco in January of 2018.

317.   The benefit to Crowley of keeping Vanessa's Treminio's November and December rape allegations against Blanco "confidential" were obvious, and in

Treminio's amended complaint, she recounts that during the call with Crowley VP of Ethics Arthur LaMoureaux during which she reported being raped by Blanco during a November 2017 business trip, LaMoureaux "*told Mrs. Treminio that if her story ever became public, it could severely damage the company's reputation and tarnish its relationship with the U.S. government, which was one of the company's largest and most important customers. In that call, Mr. LaMoureaux specifically mentioned Crowley's "Defense Freight Transportation Services (DFTS)" contracts, which were worth billions of dollars, and the emergency response contracts for hurricane relief in Puerto Rico. Mr. LaMoureaux inelegantly explained that these contracts paid Mrs. Treminio's salary and the salaries of many other Crowley employees, and that a clean public image was very important to Crowley in maintaining those contracts and the relationships they were built on.*" **Exhibit 1 ¶¶** 70, 71, 72, 73.

318.   A direct, causal relationship therefore exists between the benefits and value received by Crowley in connection with its cover-up of Treminio's rape allegations against Blanco, made to Lopez and LaMoureaux, in November and December of 2017, and the sexual abuse Plaintiff endured at the hands of Blanco in January of 2018. But for that cover-up, Plaintiff would not have been sexually abused by Blanco in January of 2018. Crowley made the conscious decision, at the highest levels of its company, to allow Blanco to continue trafficking and sexually abusing

its vulnerable Salvadoran female employees on international business trips in order to protect its corporate reputation, government contracts, and profits.

319.  Through common law theories of vicarious liability, Crowley is liable as a Principal/Perpetrator for the negligent, tortious and criminal misdeeds of its executives, employees and agents involving trafficking Plaintiff, because multiple Crowley agents and employees acted within the actual or apparent scope of their employment or authority, and some of these agents intended, at least in part, to in some way benefit Crowley Maritime Corporation through their actions.

## Venture / Beneficiary Liability Claim

320.  In violation of 18 U.S.C. § 1591, Crowley Maritime Corporation ("Crowley") did knowingly benefit, financially or by receiving anything of value, from participation in a venture of two or more individuals associated in fact, in or affecting interstate or foreign commerce, in which Plaintiff was recruited, enticed, harbored, transported, or obtained by any means, when Crowley knew, or was in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause the Plaintiff to engage in a commercial sex act.

321.  The statute of limitations for violations of the sex trafficking statute is 10 years. 18 U.S.C. § 1595. The Plaintiff was affected within the 10 years prior to filing suit.

322.  To state a venture or beneficiary claim under § 1595(a), Plaintiff must plausibly allege that defendant Crowley (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPA as to Plaintiff, and (4) Crowley had constructive or actual knowledge that the undertaking or enterprise would violate the TVPA as to the plaintiff.

323.  The participation element of a beneficiary claim under § 1595(a) does not require Crowley to have participated in the sex trafficking act itself. Participation in a venture only requires that Defendant Crowley took part in a common undertaking or enterprise with co-Defendant Juan Emilio Blanco that involved risk and potential profit.

324.  By employing Blanco for years and promoting him to an important role in the company where he was responsible for managing a large team of Crowley employees and responsible for the implementation of key parts of a multi-billion-dollar contract with the U.S. Department of Defense, Defendant Crowley and Defendant Blanco were participants in a common undertaking or enterprise that involved risk and potential profit. The DFTS training trips to Jacksonville, Florida during which Blanco raped Vanessa Treminio and sexually attacked and attempted to rape Plaintiff were also common undertakings or enterprises that involved risk and potential profit in which both Crowley and Blanco were participants. Crowley

knowingly benefitted from its ongoing business relationship with Blanco and from the DFTS training trips.

325. The common undertakings or enterprises described in ¶ 324 of this complaint violated the TVPA as to Plaintiff, as she was forced to engage in a "*commercial sex act*," defined as "*any sex act on account of which anything of value would be given to or received by any person*." In ¶¶ 290-295 of this complaint, Plaintiff states numerous "things of value" received by her in return for going on an international business trip with a man she warned Crowley had subjected her to humiliating and terrifying sexual harassment, and who she warned Crowley she did not feel safe traveling with on an international business trip.

326.  In ¶¶ 316-317 of this complaint, Plaintiff details the things of value received by Crowley in connection with the sexual abuse she endured at the hands of Blanco in January of 2018. In ¶ 318 of this complaint, Plaintiff states that a direct, causal relationship exists between the benefits and value received by Crowley in connection with its cover-up of Treminio's rape allegations against Blanco, made to Lopez and LaMoureaux, in November and December of 2017, and the sexual abuse Plaintiff endured at the hands of Blanco in January of 2018. But for that cover-up, Plaintiff would not have been sexually abused by Blanco in January of 2018. Had LaMoureaux reported Treminio's rape allegations to law enforcement, or otherwise conducted a proper investigation of Treminio's allegations instead of

keeping the reported rape "confidential," Plaintiff would not have been trafficked and sexually abused by Blanco in January of 2018.

327.   Crowley had constructive and actual knowledge that the undertaking or enterprise would violate the TVPA as to Plaintiff. Constructive knowledge is knowledge which one using reasonable care or diligence should have. Constructive knowledge is a negligence standard. Based on the many facts contained in the Exhibits attached to this Complaint, Crowley *actually knew and should have known* that its undertaking or enterprise with Blanco would violate the TVPA as to the Plaintiff, Ms. Doe.

328.   Due to Vanessa Treminio's prior allegations and the numerous reports and investigations documented by Crowley, Crowley actually knew, and should have known, that its undertaking or enterprise with Blanco would violate the TVPA as to Plaintiff.

WHEREFORE, by virtue of these violations of 18 U.S.C. §§ 1591, 1595, Plaintiff respectfully requests this Court to enter judgment against Defendant Crowley Maritime Corporation for compensatory damages, consequential damages, and punitive damages in an amount to be determined at trial, as well as interest, costs, and for such further and other relief as this Court deems appropriate and demands a trial by jury.

## THIRD CAUSE OF ACTION
(Sexual Battery)
Against JUAN EMILIO BLANCO

329.   Plaintiff incorporates the allegations in paragraphs 1 through 281, as if fully set forth herein.

330.   Juan Emilio Blanco sexually attacked Plaintiff in his wife's home and fondled, touched, and groped her for his own sexual gratification.

331.   Juan Emilio Blanco's tortious conduct was harmful and offensive and caused Plaintiff injury, damage, loss, and harm.

332.   Under Florida law, an action for assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort must be commenced within 4 years. Fla. Stat. § 95.11.

333.   After sexually attacking Plaintiff in Jacksonville, Florida, Juan Emilio Blanco fled the State of Florida and the United States and flew to El Salvador. Defendant Crowley Maritime Corporation assisted Juan Emilio Blanco in his flight from the state and from justice.

334.   Florida law provides that the applicable 4 year statute of limitations is tolled by the absence from the state of the person to be sued. Fla. Stat. § 95.051.

335.   Upon information and belief, Juan Emilio Blanco remained in El Salvador, outside of the jurisdiction of the United States, or outside of the state of Florida

long enough to toll the statute of limitations for civil claims against Juan Emilio Blanco in this lawsuit arising out of his sexual battery of Plaintiff in January 2018.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment against Defendant Juan Emilio Blanco for compensatory damages, consequential damages, and punitive damages in an amount to be determined at trial, as well as interest, costs, and for such further and other relief as this Court deems appropriate and demands a trial by jury.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated April 3, 2023

Respectfully submitted,

/s/  Adria G. Notari
**ADRIA G. NOTARI**
Florida Bar No. 87272
NOTARI  LAW, P.A.
1820 SW 14th Court
Fort Lauderdale, Florida 33312
Telephone: (954) 257-9028
Fax: (954) 231-1128
E-mail: anotari@NotariLaw.com

/s/  J. Ryan Melogy
**J. RYAN MELOGY***
Maritime Legal Solutions, PLLC
276 Fifth Ave., Suite 704-1454
New York, NY 10001
Telephone: (347) 562-9119
E-mail: maritimelegalsolutions@pm.me

*pro hac vice* application forthcoming